**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**AUG 16 2000**

**PATRICK FISHER**
**Clerk**

<u>PUBLISH</u>

## UNITED STATES COURT OF APPEALS

## TENTH CIRCUIT

---

STANLEY M. KURZET and ANNE L.
KURZET,

     Petitioners-Appellants,

v.

COMMISSIONER OF INTERNAL
REVENUE,

     Respondent-Appellee.

No. 97-9028

---

**Appeal from the United States Tax Court**
**(Tax Court No. 27982-91)**

---

J. Gordon Hansen of Parsons Behle & Latimer, Salt Lake City, Utah, for
Petitioners-Appellants.

Alice L. Ronk (Kenneth L. Greene with her on the brief), Tax Department,
Department of Justice, Washington, D.C., for Respondent-Appellee.

---

Before **SEYMOUR**, Chief Judge, **BRORBY** and **EBEL**, Circuit Judges.

---

**EBEL**, Circuit Judge.

---

Appellants Stanley and Anne Kurzet (the "Kurzets," with Stanley referred to individually as "Kurzet") appeal the decision of the tax court, finding deficiencies in the personal income tax paid by the Kurzets for the years 1987, 1988, and 1989. We exercise jurisdiction pursuant to I.R.C. § 7482[1] and REVERSE in part and AFFIRM in part.

## BACKGROUND

In 1958, Kurzet formed ALS Corp., a company involved in the design and manufacture of sophisticated electronic and engineering equipment for the United States' military. In 1984, Kurzet sold his interest in ALS to a third party for $20 million in cash. In connection with the sale, Kurzet signed a noncompete agreement and also agreed to serve in a consulting capacity to ALS for the next seven years at a salary of $10,000 per month. Kurzet made various purchases with the proceeds from the sale of ALS. As relevant here, these included: (1) a timber farm in Oregon; (2) real property in Tahiti; and (3) a Lear jet. Other assets owned by the Kurzets also play a role in the issues presented on appeal. These are: (4) the Kurzet's 24-room mansion in Orange, California; (5) a warehouse in California; and (6) rental condominiums in Park City, Utah.

---

[1]On December 31, 1997, this court, sua sponte, ordered the parties to file memorandum briefs addressing whether the notice of appeal in this case was timely filed. Both parties asserted in their memorandum briefs that the notice of appeal was timely, and our review of the issue confirms that this court has jurisdiction to consider the appeal.

The Commissioner of Internal Revenue (the "Commissioner") brought an action against the Kurzets, alleging that they were deficient in their tax payments for the years 1987, 1988, and 1989 and also sought accuracy-related penalties. In an order dated January 29, 1997, the tax court found that the Kurzets were deficient in their tax payments because they claimed impermissible tax deductions in connection with the Tahiti property, the Lear jet, and their California home, but did not require the Kurzets to pay any accuracy-related penalties. The tax court felt that penalties were not appropriate in light of the fact that the "errors on the tax returns were attributable to the amateurish books and records that the petitioners unfortunately established to keep track of their business, investment, and personal activities" and the fact that the Kurzets had hired professional tax preparers who failed to explain the accounting problems to the couple.

The tax court made additional findings in an opinion issued from the bench on February 24, 1997, resolving a number of issues that had been omitted from the written order of January 29. As relevant here, in the bench opinion, the tax court refused to allow the Kurzets to change the manner in which they calculated depreciation for the reservoir they had constructed on their timber farm.

On appeal, the Kurzets assert four claims of error. First, the Kurzets urge that the tax court erred in determining that the expenses attributable to the use of the Kurzets' Lear jet were not deductible pursuant to I.R.C. § 162. Second, the

Kurzets argue that the tax court erred in concluding that none of the expenses attributable to the Kurzets' California residence were deductible pursuant to I.R.C. § 280A(c)(1). Third, the Kurzets argue that the tax court erred in determining that the Kurzet's Tahiti property was a recreational or personal use property rather than an investment under I.R.C. § 212. Finally, the Kurzets complain that they were not entitled to change the cost recovery period on the reservoir constructed on the Kurzets' timber farm from 31.5 years to 15 years. We reverse as to the Kurzets' first claim of error but affirm as to the three remaining issues.

## DISCUSSION

We review tax court decisions "in the same manner and to the same extent as decisions of the district courts in civil actions tried without a jury." I.R.C. § 7482(a)(1).

> We review the Tax Court's factual findings under the clearly erroneous standard and review its legal conclusions de novo. We review mixed questions of law and fact either under the clearly erroneous standard or de novo, depending on whether the mixed question is primarily factual or legal.

Anderson v. Commissioner, 62 F.3d 1266, 1270 (10th Cir. 1995) (internal citations omitted). "The Supreme Court has defined mixed questions as those in which the historical facts are admitted or established, the rule of law is undisputed, and the issue is whether the facts satisfy the statutory standard, or to

put it another way, whether the rule of law as applied to the established facts is or is not violated." Love Box Co. v. Commissioner, 842 F.2d 1213, 1215 n.2 (10th Cir. 1988) (internal quotations and citation omitted).

## I.    Deduction of Lear Jet Expenses

Section 162 of the Internal Revenue Code allows a taxpayer to "deduct[] all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business." The Kurzets claimed deductions on their tax returns for the years 1987, 1988, and 1989 pursuant to § 162 for expenses related to the operation of their Lear jet. The Kurzets used their jet to travel to their properties in Oregon, Utah, and Tahiti from their home in California and to transport equipment.

The tax court denied all of the deductions sought by the Kurzets in connection with the operation of their Lear jet. In its written opinion, the tax court initially noted that the Kurzets were not entitled to deduct travel expenses for their trips to Tahiti in light of its conclusion that the Tahiti property was not held as investment property. The tax court then went on to explain that the "large transportation expenses (including significant noncash expenses such as depreciation) associated with the Lear jet appear to be out of the ordinary and unnecessary in light of the fact that petitioner's timber farm was not producing any current income (due to petitioner's decision to defer cutting any of the

timber)." The tax court also regarded the "inconvenience that petitioners would have experienced a few times a year in flying to the Oregon timber farm via commercial air carrier" as minimal, ordinary, and common for individuals as well as businessmen. The tax court found that the Kurzets did not establish that they had incurred the "extravagant costs of purchasing and maintaining a Lear jet to avoid such infrequent and slight inconvenience." The tax court did not preclude the Kurzets from deducting any costs associated with their travel to Oregon from their home in California, however. Rather, relying on its earlier determination that the Kurzets held and managed the timber farm as a "for-profit business activity," the tax court allowed the Kurzets to deduct the cost of first-class travel on a commercial carrier for each of the trips. Finally, the tax court found that, although the Kurzets used the jet to transport equipment and machinery to Oregon, they had not provided a basis upon which the court could estimate what those transportation expenses would have been, and therefore denied any deduction for this use.

The taxpayer bears the burden of proving his or her expenditures are "ordinary and reasonable" under § 162. See Love Box Co., 842 F.2d at 1216. The Supreme Court has indicated that an ordinary expense is one that is "normal, usual, or customary." Deputy v. Du Pont, 308 U.S. 488, 495, 60 S. Ct. 363, 84 L. Ed. 416 (1940). Similarly, the Supreme Court has explained that an expense is

ordinary if it is a "common and accepted" expense for the taxpayer, comparing the taxpayer to "the group, the community, of which he is a part." Welch v. Helvering, 290 U.S. 111, 114, 54 S. Ct. 8, 78 L. Ed. 212 (1933). Expenses are necessary if they are "appropriate and helpful." Id. at 113. For an expense to be considered ordinary and necessary, it must also be reasonable in amount. See Harmon City, Inc. v. United States, 733 F.2d 1381, 1383 (10th Cir. 1984) ("Although [§ 162] does not limit deductions . . . to a 'reasonable' amount, the reasonableness of such payments must be explored to determine whether they are 'ordinary and necessary' . . . ."); Commissioner v. Lincoln Electric Co., 176 F.2d 815, 817 (6th Cir. 1949) ("[T]he element of reasonableness is inherent in the phrase 'ordinary and necessary.'"); United States v. Haskell Eng'g. & Supply Co., 380 F.2d 786, 789 (9th Cir. 1967) (same (citing Lincoln)); see also Treas. Reg. § 1.162-2(a) ("Only such traveling expenses as are reasonable and necessary in the conduct of the taxpayer's business and directly attributable to it may be deducted.").

Both parties construe the tax court's decision in denying the deductability of Lear jet expenses in flying to and from the Kurzets' timber farm in Oregon as a finding that such expenses were not ordinary and necessary because they were "unreasonable," and we agree with this interpretation of the opinion. Thus, in this appeal, we are primarily concerned with the question of whether the actual

costs of operating the Lear jet were reasonable and could therefore be considered "ordinary and necessary" business expenses in connection with travel related to the Oregon timber farm. This circuit considers the question of whether expenses are reasonable, and are therefore ordinary and necessary under § 162, to be a factual question, and we therefore review for clear error. See Harmon City, 733 F.2d at 1385; Cooke v. Commissioner, 203 F.2d 258, 262 (10th Cir. 1953); Rota-Cone Oil Field Operating Co. v. Commissioner, 171 F.2d 219, 222 (10th Cir. 1948).

The Kurzets urge that the tax court made a number of mistakes in connection with its assessment of whether the expenses attributable to the operation of the Lear jet for travel related to the Oregon timber farm were reasonable and that these errors require this court to reverse the tax court's determination that actual expenses associated with operating the jet were not deductible pursuant to § 162. We agree with the Kurzets that the tax court's determination of reasonableness was clearly erroneous.

First, the Kurzets argue that the trial court improperly considered the amount of depreciation claimed on the jet when it considered whether the expenses the Kurzets sought to deduct were reasonable. The tax court opinion concluded, "[t]he large transportation expenses (including significant noncash expenses such as depreciation) associated with the Lear jet appear to be out of the

ordinary and unnecessary." (Emphasis added.) The Kurzets cite the tax court decision in Noyce v. Commissioner, 97 T.C. 670, 687 (1991), for the proposition that the depreciation of an airplane should not be considered when determining whether the expenses relating to the operation of the plane are reasonable for purposes of § 162.

In addition, the Kurzets argue that the tax court grossly underestimated the number of trips they took to Oregon. In its written opinion, the tax court found that the Kurzets traveled to their Oregon timber farm "4 or 5" times a year. In its later bench ruling, the tax court revised the factual finding made in its earlier written order when it assessed the constructive amount of traveling expenses that the Kurzets could deduct. Specifically, the tax court concluded that the Kurzets had made 74 trips to Oregon between them during the three-year period in question, with Kurzet making 14 trips in 1987, 11 trips in 1988, and 14 trips in 1989,[2] and his wife making 14 trips in 1987, 9 trips in 1988, and 12 trips in 1989.

Finally, the Kurzets argue that the tax court did not include a calculation of the time saved as a result of their use of the jet in determining whether the

---

[2]The Kurzets contend that the tax court found that Kurzet made a total of 41 trips to Oregon in 1987, 1988, and 1989. While this may be true, the record reflects that Kurzet took two of the trips made in 1987 in his Cessna. Thus, these trips should not be considered in determining whether the costs associated with the operation of the Lear jet were reasonable.

amount of the expenses was reasonable.[3]  The Kurzets argue that this factor was significant because each of their round trips to Oregon on the Lear jet saved 12 hours of travel time over commercial air travel.

We are persuaded by these arguments and conclude that the tax court clearly erred in determining that the Kurzets' expenses associated with operating the Lear jet for travel related to the timber farm were unreasonable and therefore nondeductible pursuant to § 162.  As an initial matter, we find that the tax court improperly considered depreciation in its assessment of reasonableness.  In Noyce, the tax court held that depreciation should not be considered in assessing whether business expenses are reasonable under § 162.  Noyce, 97 T.C. at 687-88.  In reaching this conclusion, the tax court first looked to the definition of "business expense" under Treasury Regulation § 1.162-1(a).  See id. at 687.  Section 1.162-1(a) provides:

> Business expenses deductible from gross income include the ordinary and necessary expenditures directly connected with or pertaining to the taxpayer's trade or business, except items which are used as the basis for a deduction or a credit under provisions of law other than section 162.

---

[3]The Kurzets also contend that the tax court erred by failing to consider the fact that the jet was used to travel to machinery auctions and haul equipment for the timber farm.  Our review of the tax court's written order indicates that the tax court did, in fact, consider these uses for the jet in assessing reasonableness. However, the tax court determined that there was insufficient evidence in the record to calculate the constructive cost of transporting the equipment and therefore denied the Kurzets' deductions for these costs.

The tax court then explained that depreciation is "not really an 'expenditure' but an allowance based on a presumed wasting of a previous capital investment" and further noted that deductions for depreciation are governed by I.R.C. § 168. See id. at 688. Based on these observations, the tax court concluded that depreciation does not "fall under the regulatory rubric of trade or business expense" and therefore should not be included in the amount of business expense when assessing the reasonableness of that expense. Id. We agree with the reasoning in Noyce. Despite the Commissioner's assertion to the contrary, we also find that the tax court's written order reflects that it did, in fact, include depreciation in its assessment of whether the costs associated with operating the Lear jet were reasonable.[4] For these reasons, we conclude that the tax court improperly considered depreciation in its assessment of the reasonableness of the expenses associated with the Lear jet.

By including depreciation in the costs associated with operating the airplane, the tax court was weighing reasonableness based on drastically overinflated numbers. In 1987, 1988, and 1989, the Kurzets claimed that the total amount of costs, including depreciation, attributable to their travel to the timber

_____

[4]In the findings of fact, the tax court stated that "[t]he Lear jet operating expenses for 1987, 1988, and 1989, including depreciation totaled $667,709, $728,201, and $402,399, respectively." (Emphasis added.) In addition, and as noted above, the tax court referred to the fact that the transportation expenses included noncash expenses such as depreciation in its analysis of the issue.

farm was $326,546, $307,332, and $97,895, respectively. For each of these years, however, the alleged total cost for operating the jet allocable to the operation of the timber farm, excluding depreciation, was only about $120,064, $121,871, and $42,582.[5] Thus, by including depreciation costs, the costs the tax court actually considered in assessing reasonableness were more than two times the amount it should have considered.

We also agree with the Kurzets' contention that the tax court significantly underestimated the number of trips the Kurzets took to their Oregon property in assessing reasonableness. Based on the estimate in the written order that the Kurzets took four or five trips a year to their Oregon property, the tax court must have believed that Kurzet and his wife made, at most, 30 trips to Oregon between them during 1987, 1988, and 1989. This figure represents less than half of the actual number of trips the tax court later calculated the Kurzets to have taken to Oregon on the Lear jet. Underestimating by more than one half the number of trips caused the tax court to overestimate by more than a factor of two the cost,

---

[5]These figures are found only in the Commissioner's brief and the Commissioner does not provide a cite to the record, other than to say these figures are from the Kurzets' tax court brief, which we could not locate as part of the record. However, we were able to extrapolate roughly comparable figures from Joint Exhibit 66BN. For purposes of making a reasonableness determination, we accept the figures in the Commissioner's brief, although for purposes of actually calculating the taxes due, the tax court may need to make a more precise calculation of this amount on remand.

and hence the reasonableness or unreasonableness of the cost per trip for the Kurzets to use the Lear jet in flying to and from their Oregon timber farm.

While the tax court referred to the "inconvenience" associated with normal commercial air travel versus use of the Lear jet in the written order, we also find that the tax court did not give sufficient weight to the time-savings associated with the use of the Lear jet. The tax court made a factual finding that the average time for one-way commercial air travel between Orange, California and North Bend, Oregon was nine hours and involved two stops and at least one change of planes. The record reflects that this trip took less than three hours one way when using the Lear jet. Thus, our review of the record confirms the Kurzets' claim that they saved twelve hours round trip when flying from California to Oregon. Based on a twelve-hour savings, the Kurzets saved approximately 888 hours of travel time when making the 74 trips to Oregon in 1987, 1988, and 1989. This is 528 hours more than the amount of time saved based on the tax court's initial erroneous estimate of 30 trips.

Based on the correct number of trips, the fact that the Kurzets saved twelve hours each per trip, the tax court's finding that Kurzet's time was worth $200/hour, and the tax court's finding that the cost of a first-class round-trip ticket was $1,600, a rough estimate of the value to the Kurzets of the use of the Lear jet to fly from California to Oregon for 1987, 1988, and 1989 was $156,800,

$112,000, and $145,600, respectively. Given that the Kurzets actually sought to deduct only $120,064, $121,871, and $42,582, for trips allocable to the operation of the timber farm for years 1987, 1988, and 1989, respectively, and that our rough estimates do not account for the value of Mrs. Kurzet's time or for any value associated with the transportation of equipment to the timber farm, we conclude that the expenses which the Kurzets sought to deduct were reasonable.

In conclusion, we find that the tax court clearly erred in finding that the Kurzets' deductions for the cost of operating the Lear jet were not reasonable based on its significant overestimation of the costs and significant underestimation of the use and benefits derived by the Kurzets from the Lear jet. While we conclude that the expenses associated with travel from California to Oregon were, in fact, reasonable, we decline to make a determination as to the actual amount of the expenses the Kurzets may deduct pursuant to § 162 because some modest adjustments in these figures may be necessary in order to determine the precise amount to allocate for travel and equipment transportation expenses related to the Oregon timber farm. We therefore instruct the tax court to make factual findings on remand as to the amount of the expenses associated with the Lear jet that can properly be attributed to the operation of the Kurzets' timber farm.

## II. Home Office Deduction for the California Residence

Section 280A of the Internal Revenue Code provides that a taxpayer is not allowed to make deductions with respect to his dwelling unit but that an exception applies where a portion of the dwelling unit is used exclusively on a regular basis as the principal place of business for any trade or business of the taxpayer. See I.R.C. § 280A(c)(1)(A). The Kurzets argue that the tax court erred in finding that they were not entitled to deductions in connection with the use of a portion of their home as a "principal place of business" for various business activities that they conducted. The Kurzets sought to deduct one-fifth of all expenses of their residence in Orange, California. The Kurzets urge that the deduction is appropriate because a number of rooms in their twenty-four room mansion were dedicated to business activities, including their real estate business,[6] Kurzet's consulting position at ALS, and a computer business.

The tax court found that the Kurzets "had rooms in [the California] residence in which the petitioner performed paperwork and computer tasks associated with his various activities" and that they "also performed bookkeeping, maintained reference manuals and industry publications, and paid numerous bills relating to their many activities" in these rooms. The tax court further found that

---

[6]The Kurzets owned and rented out a commercial warehouse in California and two condominiums in Park City, Utah. The court found that the extent to which a real estate management company was used in connection with the Utah properties was not clear.

there was one room in the basement of the house where the Kurzets kept a computer and a copy machine; one room in the upper level where Mrs. Kurzet reviewed, paid, and maintained files relating to business and personal bills and activities; and two additional rooms on the upper level where Kurzet maintained an office and a lab with electronic circuit testing equipment related to his consulting duties at ALS. Finally, the tax court found that Kurzet performed consulting work for ALS about three or four times a year during the years in question and that he had no clients other than ALS.

The tax court concluded that the Kurzets did not show that the home was the principal place of business for any of their business activities under § 280A. The court reasoned that the Oregon property was the principal place of business for the timber farm, that ALS was the principal place of business for Kurzet's consulting activities, and that the evidence in the record did not enable the court to find that the Kurzets' home was the principal place of business for their computer and real estate rental businesses. The court acknowledged the extensive investment activities of the Kurzets, but emphasized that even where there is no suitable office or place outside of the taxpayer's residence, the taxpayer may not automatically claim a deduction. The tax court stated that use of one's personal residence to manage investments does not create a home office for purposes of § 280A.

The taxpayer bears the burden of proving that he is entitled to a deduction for a home office pursuant to § 280A. See Pomarantz v. Commissioner, 867 F.2d 495, 496 (9th Cir. 1988). The Supreme Court set forth the manner in which the principal place of business is to be determined under § 280A in Commissioner v. Soliman, 506 U.S. 168, 113 S. Ct. 701, 121 L. Ed. 2d 634 (1993). In Soliman, the Court found that a determination of whether the home office is the principal place of business necessarily requires a comparison between the home and other places of business. See id. at 174. The Court indicated that two factors should be considered in making this comparison: (1) "the relative importance of the activities performed at each business location"; and (2) "the time spent at each place." Id. at 175. The Court also emphasized, however, that

> [t]here may be cases when there is no principal place of business, and the courts and the Commissioner should not strain to conclude that a home office qualifies for the deduction simply because no other location seems to be the principal place. The taxpayer's house does not become a principal place of business by default.

Id. at 177. In addition to showing that the home office is the principal place of business, § 280A also requires a taxpayer to prove that the home office was used "exclusively" and "on a regular basis" as the principal place of business. See I.R.C. § 280A(c)(1)(A); see also Langer v. Commissioner, 989 F.2d 294, 295 (8th Cir. 1993) (affirming tax court's denial of home office deduction based on taxpayer's failure to show exclusive use); Browning v. Commissioner, 890 F.2d

- 17 -

1084, 1087-88 (9th Cir. 1989) (affirming tax court's denial of home office deduction because taxpayer failed to meet requirement of regular use).

Whether a taxpayer's residence is his personal place of business is primarily a factual question, and we therefore review the tax court's findings in this case for clear error. See Langer, 989 F.2d at 295; Pomarantz 867 F.2d at 497. Reviewing the tax court's finding that the Kurzets were not entitled to deduct home office expenses under this standard, we cannot conclude that reversal is warranted in this case.

The Kurzets argue that the tax court did not apply the balancing test set forth in Soliman. We find that this contention is without merit. The tax court cited Soliman in the written opinion and clearly balanced the importance of the activities and the time spent at each location with respect to the timber farm. The tax court's conclusion with respect to the timber farm is clearly correct in light of the extensive time the Kurzets spent there and the extent to which improvements on the Oregon property were the focus of the business.

To the extent that the tax court's application of the Solimon "balancing" is less clear in connection with the remaining businesses, we nonetheless cannot find clear error. The Kurzets do not refer to factual findings of the tax court or other facts in the record that would allow this court to evaluate the manner in which they used the rooms in their home. The Kurzets merely make the

conclusory assertion in their brief that all of their activities related to the consulting work and the real estate and computer businesses were conducted from their home. The Supreme Court clearly indicated in <u>Solimon</u> that courts are not to conclude that the home is the principal place of business by default. Thus, the Kurzets' assertion that there is no other place of business with respect to some of the Kurzets' business ventures does not automatically entitle them to a home office deduction and is an insufficient basis for this court to find clear error. This court is also persuaded that the Kurzets are not entitled to a home office deduction in light of their failure to direct this court's attention to portions of the record which clearly establish that their use of these rooms was "exclusive" and "regular" as required pursuant to § 280A.

## III. Investment Property Deduction for Tahiti Home

Section 212(2) of the Internal Revenue Code provides that an individual may deduct all the ordinary and necessary expenses paid or incurred during the taxable year for the "management, conservation, or maintenance of property held for the production of income." The Kurzets allege that the trial court erred in finding that the Tahiti property was not held for the production of income and that their expenses relating to the Tahiti property were therefore not deductible.

In denying deductions for the Kurzets' Tahiti property, the tax court found that the property "has inherently associated with it extensive recreational and

- 19 -

personal aspects" and that the Kurzets did not "satisfy their burden of proof that the Tahiti Property was held and managed by them for anything other than personal reasons." The court also noted that the Kurzets did not maintain complete and adequate records with regard to expenditures made on the property and that there was no proof of the unrealized economic gain of $1.94 million dollars on the property claimed by the Kurzets. Specifically, the court determined that "no credible evidence supports either the amount or nature of the claimed expenses petitioners incurred on the Tahiti Property, nor the fair market value of the Tahiti Property."

Like all other deductions, the taxpayer bears the burden of proving that he is entitled to a deduction for expenses related to investment property. See Welch, 290 U.S. at 115; Cannon v. Commissioner, 949 F.2d 345, 350 (10th Cir. 1991). The tax regulations set forth guidelines for determining if an activity is engaged in for profit, and provide, in part, that "greater weight is given to objective facts than to the taxpayer's mere statement of his intent." Treas. Reg. § 1.183-2(a).[7]

---

[7]Section 183 of the Internal Revenue Code provides that deductions are generally not allowed where an activity is not engaged in for profit. The code defines an activity not engaged in for profit with reference to § 212. See I.R.C. § 183(c). Similarly, the regulations accompanying § 212 specifically refer to § 183. See Treas. Reg. § 1.212-1(c) ("For provisions relating to activities not engaged in for profit applicable to taxable years beginning after December 31, 1969, see section 183 and the regulations thereunder.") In light of the interrelated nature of §§ 183 and 212, it is appropriate to refer to Treasury Regulation § 1.183-2 in our

(continued...)

The regulations further instruct us to take "all facts and circumstances with respect to the activity . . . into account," when deciding if property is used for personal or investment purposes, but warn that "no one factor is determinative in making this determination." Id. § 1.183-2(b). The regulation states that the following factors are among those which should normally be taken into account in determining if a taxpayer is entitled to a deduction pursuant to § 212(2): (1) manner in which the taxpayer carries on the activity; (2) expertise of the taxpayer or his advisors; (3) time and effort expended by the taxpayer in carrying on the activity; (4) expectation that assets used in activity may appreciate in value; (5) the success of the taxpayer in carrying on other similar or dissimilar activities; (6) the taxpayer's history of income or losses with respect to the activity; (7) the amount of occasional profits, if any, which are earned; (8) the financial status of the taxpayer; and (9) elements of personal pleasure or recreation. See id.

In support of their claim that the tax court erred in finding that there were no allowable deductions for expenses on the Tahiti property, the Kurzets emphasize that there was evidence in the trial record to support the conclusion that their home in Tahiti was investment property. The Kurzets point to: (1) the summary of the expenses they incurred on the Tahiti property; (2) the fact that the

    [7](...continued)
analysis. See Cannon, 949 F.2d at 349.

property was listed for sale in 1989; (3) Kurzet's testimony that he believed that the property increased in value to $3.7 million by 1994;[8] (4) testimony regarding the fact that money was transferred from the United States to Tahiti to improve the property; and (5) testimony from the Kurzets and two of their former employees that the Kurzets spent all of their time in Tahiti working to improve the property and none of it swimming in the ocean or otherwise relaxing.

We review the question of whether an activity has been engaged in for profit pursuant to § 212 under a clearly erroneous standard as it is a question of fact. See Cannon, 949 F.2d at 349. In light of the factors to be considered under the regulations, we find that the district court did not clearly err in denying the deduction pursuant to § 212.

While the fact that the Kurzets had not realized a profit on their property is not fatal to their claim, see Treas. Reg. § 1.183-2(b)(4) ("[T]he taxpayer may

---

[8]The Kurzets argue that the tax court improperly excluded a then-current appraisal of the property. The record reflects that the Kurzets sought to admit this evidence pursuant to Federal Rule of Evidence 807 (formerly Federal Rule of Evidence 803(24)), but that the Commissioner objected on the ground that he had not received adequate notice as required under the rule. We find no abuse of discretion in this ruling. See Cartier v. Jackson, 59 F.3d 1046, 1048 (10th Cir. 1995) (explaining that this court reviews evidentiary rulings under an abuse of discretion standard). The Kurzets also contend in their reply brief the tax court erred in excluding Exhibits 126 and 133, which summarized some of the Tahiti expenditures. We deem this argument to have been raised for the first time in the Kurzets' reply brief, and we therefore decline to consider it on appeal. See Lyons v. Jefferson Bank & Trust, 994 F.2d 716, 724 (10th Cir. 1993).

intend to derive a profit from the operation of the activity, and may also intend that, even if no profit from current operations is derived, an overall profit will result when appreciation in the value of land used in the activity is realized since income from the activity together with the appreciation of land will exceed expenses of operation."), we nonetheless find that there is no evidence in the record which shows that the tax court was clearly erroneous in finding that the Kurzets had failed to show that the Tahiti property was held for profit.

The Kurzets' recordkeeping concerning their expenditures relating to the Tahiti property weighs both ways. The treasury regulations indicate that "the fact that the taxpayer carries on the activity in a businesslike manner and maintains complete and accurate books and records may indicate that the activity is engaged in for profit." Id. § 1.183-2(b)(1). Thus, conversely, the inadequate record keeping supports the conclusion that an activity was not engaged in for profit. In their opening brief, the Kurzets only point to a conclusory summary of their expenses related to the Tahiti property and testimony of Mrs. Kurzet that she kept track of the money transfers and expenditures related to the Tahiti property on her home computer. This would not satisfy the recordkeeping factor. However, in their reply brief, the Kurzets refer to Joint Exhibit 70BR as evidence of their expenses associated with the Tahiti property. Exhibit 70BR provides a list of every expenditure the Kurzets' made by check and credit card in the years 1987,

1988, and 1989. While these lists describe the general category for every expenditure (e.g., operating supplies, repairs and maintenance, etc.) and are more complete than the other records, we do not find that this evidence necessarily supports the conclusion that the Tahiti property was held for profit. This is because the lists indicate that the Kurzets designated most of their expense entries associated with the Tahiti property as nondeductible personal expenses. By contrast, the Kurzets sought to deduct most expenses associated with their timber farm as business expenses. In addition, adequate recordkeeping is only one of the factors to consider in determining whether the property was being held for profit.

With respect to the second factor, there is no evidence to show that the Kurzets prepared to invest in Tahiti by "extensive study of its accepted business, economic, and scientific practices," see id. § 1.183-2(b)(2), or that they sought advice concerning the investment. This is in contrast to their decision to invest in the timber farm.

While the fact that the Kurzets spent considerable time and effort working to improve the property is an indication that they may have purchased the Tahiti property with an eye toward obtaining a profit, this fact does not compel the conclusion that the tax court erred. The Kurzets could easily have sought to make the improvements to the property for the purpose of maximizing their own enjoyment. See Carkhuff v. Commissioner, 425 F.2d 1400, 1405 (6th Cir. 1970)

(finding that improvements that taxpayers had made to a vacation cottage which would have made the cottage suitable for rental also could have been "intended to satisfy the personal tastes and comfort of the taxpayers" and explaining that "[t]he making of repairs and improvements . . . does not compel the conclusion that a profit motive was present."). Indeed, the tax court found that the following improvements, which are consistent with personal enjoyment, were made to the Tahiti property: "petitioners or others paid by petitioners remodeled and renovated a house, installed a solar heating system, a spa, a culinary water system, and underground utilities, dredged a boat channel, added a satellite TV system, converted the electrical power to 110 volts, installed a diesel power generator as an alternate source of electricity, and made other significant improvements."

In addition, although the evidence suggesting that the Kurzets expected the property to appreciate in value carries some weight, we conclude that it does not compel a finding of error on the part of the tax court either. Kurzet testified that he purchased the property because of its "excellent commercial potential" and because he thought it was "an excellent hotel site." There was no evidence, however, to suggest that the Kurzets ever tried to maximize this potential by pursuing development plans with commercial developers or even by renting the

property when they were not using it.[9]  We also find persuasive the

Commissioner's argument that the Kurzets' work to develop the property was, in

fact, inconsistent with the intent to develop its commercial potential as a hotel

site.  In addition, the evidence that the Kurzets put the property on the market in

1989 does not necessarily signify that the property was purchased with the

intention of making a profit, particularly in light of the fact that the Kurzets still

owned the Tahiti property at the time of the trial in 1995.  Finally, while actual

appreciation in value may provide some evidence that a property may be held for

profit, we conclude that Kurzet's subjective believe as to the value of the property

in 1995 is not sufficient to establish a profit motive.

As a final matter, we address briefly Holmes v. Commissioner, 184 F.3d

536 (6th Cir. 1999), and Hoyle v. Commissioner, 68 T.C.M. (CCH) 1321 (1994),

which the Kurzets cite in support of their contentions relating to the § 212

deduction.   These cases deal with situations where taxpayers sought to deduct

costs associated with working farms that were also used by the taxpayers for

recreational purposes.  We find that Holmes and Hoyle have no bearing on our

---

[9]The fact that the Kurzets did not rent out the property is inconsistent with their other real estate ventures.  See Treas. Reg. 1.183-2(b)(5) (noting that the "success of the taxpayer in carrying on other similar or dissimilar activities" may be weighed in assessing profit motive).  The tax court found that an industrial warehouse and two condominiums in Park City, Utah owned by the Kurzets were all rented to tenants.  (See Add A. at 24.)

analysis in this case as the Kurzets' Tahiti property is not sufficiently analogous to a working farm. Moreover, both <u>Holmes</u> and <u>Hoyle</u> are distinguishable from the present case because there was significant evidence in those cases concerning the business activities and types of improvements that occurred on the farms, and which allowed for the conclusion that the taxpayers undertook the farming activities for the purpose of obtaining a profit.

In conclusion, we find that the tax court was not clearly erroneous in denying a deduction for the expenses associated with the Tahiti property.

## IV.  Calculation of the Cost Recovery Period on the Reservoir

At trial, the Kurzets sought to change the period of time over which the reservoir located on their Oregon property was depreciated. The Kurzets had constructed the reservoir in 1988 after purchasing the timber farm. On the tax returns filed by the Kurzets, they calculated the amount of depreciation of the reservoir based on a 31.5-year recovery period. The Kurzets argued before the tax court that the depreciation of the reservoir actually should have been calculated pursuant to a 15-year recovery period.

As relevant here, prior to enactment of the Accelerated Cost Recovery System ("ACRS") and Modified Accelerated Cost Recovery System ("MACRS") schemes for depreciation, the period of time used to determine the amount of depreciation that could be claimed by a taxpayer was called the "useful life." The

useful life was the period of time over which the asset may be reasonably expected to be useful to the taxpayer in his trade or business. See Treas. Reg. § 1.167(a)-1(b). Useful life was determined by weighing a number of factors, including wear and tear, industry developments and changes in the taxpayer's business, climatic conditions peculiar to the taxpayer's trade or business, and the taxpayer's policy as to repairs. See id. Thus, the regulations reflect that the useful life of an asset was calculated on a case-by-case basis. Congress enacted the ACRS depreciation scheme in 1981 and assigned all types of depreciable assets predetermined recovery periods, thus abandoning the "useful life" concept with regard to property acquired after 1980. See Grinalds v. Commissioner, 65 T.C.M. (CCH) 1971, 1972 (1993); see also Rev. Proc. 87-56, 1987-2 C.B. 674 (setting forth recovery period for various assets). The parties agree that, under the current MACRS scheme (the successor to the ACRS scheme), the reservoir recovery period would be 15 years.

The tax court decided this issue in its bench opinion of February 24, 1997. The tax court made three findings in connection with the Kurzets' claim. First, the tax court found that the Kurzets had adequately raised the issues as to depreciation and that the issue was properly before the court. The court went on to "note[] and emphasize[] [that] the petitioners are not electing and utilizing MACRS. They are utilizing a straight line method." Based on this factual

finding as to the method of accounting used by the Kurzets to calculate depreciation, the court concluded:

> The straight line method taxpayer for useful life does not necessarily use an MACRS or ACRS class life, but rather the economically determined actual useful life of the asset. There is no evidence here that–specific evidence as to–that would support the change from 31 [sic] years as claimed on the taxpayers' return to the 15 years as an economic matter, and the court declines to approve of this required change in the useful life of the reservoir based on the lack of evidence that would support it.

As an initial matter, we must address the Commissioner's assertion that the Kurzets waived this argument before the tax court. In support of this argument, the Commissioner cites the fact that the none of the Kurzets' petition, amended petition, or pretrial memorandum referred to this issue and also emphasizes that the court stated during its bench opinion that the court only "reluctantly" treated the issue as having being raised. Our review of the record suggests that the tax court elected to treat the question of the recovery based on the belief that the issue had been tried by consent of the parties. We review such a finding for an abuse of discretion. See Gold v. Local 7 United Food & Commercial Workers Union, 159 F.3d 1307, 1309 (10th Cir. 1998) (decision to allow parties to amend pleadings based on trial by implied consent is discretionary). A discretionary decision of this nature should only be reversed if "we have a definite and firm conviction that the trial court made a clear error of judgment or exceeded the bounds of permissible choice in the circumstances," Richardson v. Missouri Pac.

R.R. Co., 186 F. 3d 1273, 1276 (10th Cir. 1999) (internal quotations and citation omitted).  The Commission cites no evidence that leads us to the conclusion that the issue was not tried by the parties, and we therefore decline to consider this argument to have been waived.

With respect to the substantive question presented on appeal, the Kurzets argue that the tax court correctly found that the Kurzets used a straight-line method of calculating depreciation of the reservoir, but improperly concluded that the Kurzets were not using MACRS.  The Kurzets emphasize that this error led the court to believe erroneously that the Kurzets had to provide evidence to show that the "useful life" was 15 years rather than 31.5 years.  The Kurzets argue that question of useful life is irrelevant under MACRS and that the tax court should have simply reclassified the reservoir as 15-year property pursuant to Revenue Procedure 87-56.

The first issue this court must resolve is whether the tax court improperly concluded that the Kurzets were not using MACRS to calculate depreciation.  The Kurzets contend that they were using MACRS to calculate the recovery period because the reservoir was placed in service in 1988.  Congress enacted MACRS in 1986, and it is "effective generally for tangible, depreciable property placed in service after December 31, 1986."  Hospital Corp. of America v. Commissioner, 109 T.C. 21, 42 (1997).  Thus, it would appear that MACRS should be used to

calculate depreciation for the reservoir. Moreover, the Commission agrees with the Kurzet's claim that they calculated depreciation for the reservoir under MACRS. We therefore find that the tax court erred in concluding that the Kurzets were not using MACRS.[10]

We must now determine whether the Kurzets were, in fact, entitled to change the recovery period for the reservoir under MACRS from 31.5 to 15 years. The Commissioner urges us to affirm the tax court's decision on the ground that a taxpayer can only change the recovery period with the permission of the Commissioner. The Kurzets do not dispute the Commissioner's assertion that permission to change the recovery period was not obtained. We agree with the Commissioner that it was necessary for the Kurzets' to have obtained permission in order to have changed the recovery period on the reservoir, and we affirm the tax court's decision to deny the change in recovery period on this alternate ground. See United States v. Sandoval, 29 F.3d 537, 542 n.6 (10th Cir. 1994) ("We are free to affirm a district court decision on any grounds for which there is a record sufficient to permit conclusions of law, even grounds not relied upon by the district court." (quotations omitted)).

---

[10]The Commissioner suggests that the Kurzets' attorney created the tax court's confusion. Our review of the record indicates that an attorney representing the Commissioner also contributed significantly to the court's confusion by stating, "MACRS is a different method than what they were using. They weren't using MACRS." (Emphasis added.)

Section 446(d) of the Internal Revenue Code provides that "a taxpayer who changes the method of accounting on the basis of which he regularly computes his income in keeping his books shall, before computing his taxable income under the new method, secure the consent of the Secretary." See also Treas. Reg. § 1.446(e)(2)(i) ("[A] taxpayer who changes the method of accounting employed in keeping his books shall, before computing his income upon such new method for purposes of taxation, secure the consent of the Commissioner."). Thus, the question in this case is whether a change in the recovery period under MACRS for an asset is a change in the method of accounting. Treasury Regulation § 1.446(e)(2)(ii)(a) defines this phrase as follows:

> A change in the method of accounting includes a change in the overall plan of accounting for gross income or deductions or a change in the treatment of any material item used in such overall plan . . . A material item is any item which involves the proper time for the inclusion of the item in income or the taking of a deduction.

Under the plain language of the regulation, it appears that a change in the recovery period is a change in the method of accounting because it affects the time at which a deduction is taken. However, a change in the "useful life" of an asset was not considered to be a change in an accounting method and therefore could be modified by a taxpayer without permission. See Treas. Reg. § 1.446-1(e)(2)(ii)(b) ("[A] change in the method of accounting does not include . . . an adjustment in the useful life of a depreciable asset."). The Kurzets argue that a

"recovery period" under MACRS should be treated in a like manner to its predecessor, the "useful life," and that permission to change the recovery period is therefore not required.

This approach is not consistent with that taken by the Commissioner. The Commissioner interprets the regulations as requiring a taxpayer to obtain permission for a change in the recovery period despite the fact that permission is not required for a change in useful life. See Rev. Proc. 96-31, 1996-1 C.B. 714 ("A change from not claiming the depreciation or amortization allowable . . . to claiming the depreciation allowable is a change in the method of accounting for which consent of the Commissioner is required."); I.R.S. Pub. 538 (1993) ("Some changes that are not changes in accounting methods and do not require consent are: . . . (4) an adjustment in the useful life of a depreciable asset. You cannot change the recovery period for ACRS or MACRS property (depreciable property placed in service after 1980)."). We are required to give deference to this interpretation, unless it is plainly erroneous or inconsistent with the regulation. Thomas Jefferson Univ. v. Shalala, 512 U.S. 504, 512, 114 S. Ct. 2381, 129 L. Ed. 2d 405 (1994); see also Connecticut General Life Ins. Co. v. Commissioner, 177 F.3d 136, 144 (3d Cir. 1999) (applying plainly erroneous standard to Commissioner of Internal Revenue's interpretations of Treasury Regulations);

Harbor Bancorp & Subsid. v. Commissioner, 115 F.3d 722, 727 (9th Cir. 1997) (same).

While there is some persuasive value to the argument that a change in recovery period under MACRS should be treated like a change in the useful life, we cannot conclude that the Commissioner's interpretation is "plainly erroneous" or "inconsistent" with the regulation. The plain language of the regulations only excludes an adjustment for a change in the calculation of useful life from the requirement of obtaining the Commissioner's consent. Moreover, had the Commission intended to exclude a change in recovery period under MACRS as well as a change in useful life from the permission requirement, it had ample opportunity to do so in light of the fact that Treasury Regulation § 1.466-1 was amended on at least seven occasions following the enactment of the ACRS. See T.D. 8067, 51 FR 378, Jan. 6, 1986; T.D. 8131, 52 FR 10084, March 30, 1987; T.D. 8408, 57 FR 12419, April 10, 1992; T.D. 8482, 58 FR 42233, Aug. 9, 1993; T.D. 8608, 60 FR 40078, Aug. 7, 1995; T.D. 8719, 62 FR 26741, May 15, 1997; T.D. 8742, 62 FR 68169, Dec. 31, 1997. In conclusion, we find that the tax court did not err in preventing the Kurzets from modifying the recovery period for the reservoir.

**CONCLUSION**

We reverse the judgment of the tax court with respect to its determination of whether the Kurzets were entitled to deductions for expenses associated with the operation of their Lear jet. In connection with that claim, we reverse and remand with an instruction for that court to calculate the appropriate value for the deductions and to amend its order to allow the deductions consistent with this opinion. We affirm all other aspects of the judgment.