T.C. Memo. 2005-288


UNITED STATES TAX COURT


RALEIGH COX AND BRENDA J. COX, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 11813-03.              Filed December 15, 2005.


<u>Charles A. Crocker</u>, for petitioners.

<u>Susan Greene</u>, for respondent.


MEMORANDUM OPINION

HOLMES, <u>Judge</u>:  Tax records are the ancient Egyptians of the modern age--plagued not by boils, frogs, flies, and lice but by fire, flood, mold, and theft.  The cursed tax records in this case belonged to Raleigh Cox, who owned a business that fixed used cars and then resold them.  When audited, Cox failed to produce the records that would have supported many of his claimed business deductions, and blamed their absence on a thieving

former employee. The parties have since settled most of these issues, but the Commissioner hardened his heart against Cox's deductions for cash purchases of used cars.

We must decide whether to let them go.

## Background

Raleigh Cox grew up in Houston. He is a talented mechanic, and started a small business, Washington Car Care, in 1986. He made the better part of his living by buying used cars--often cars that were nowhere near working order--from local wholesalers. He then fixed them up, and cleaned them up, and resold them to other dealers. The business was not in the most desirable section of Houston; as Cox pointedly testified, the IRS did not contest his deduction for the cost of a guard dog.

Washington Car Care's biggest problem, however, wasn't crime; it was thin capitalization. There were years when Cox was just scraping by, and he often had customers who wrote bad checks. This caused enough of Washington Car's checks to bounce that banks became unwilling to finance the business. Cox worked his way around this problem with an old solution--a trade-financed floor plan.

He set up the plan with Concord Motors, a used-car wholesaler that was his main source of supply. He and Concord would negotiate each car's price, and he would then sign a draft for that amount and leave it with Concord along with the car's

title (which in Texas is a car's proof of ownership). Under the plan, Concord gave Washington Car possession of up to $100,000-worth of cars, thus giving Cox an inventory of vehicles that he could work on. In return, Cox promised to pay Concord $2,000 a week. These payments would accumulate from week to week, and Cox would draw on their accumulated value by periodically taking back drafts and titles for cars so that he could resell them to third parties at a profit.

Cox and his wife reported Washington Car's income and deductions on a Schedule C to their 2000 income tax return, which was prepared by Roman Spiller, their long-time accountant. Spiller was a former IRS auditor, and had prepared both the Coxes' personal and business returns since 1986. Before this case they had never had any reason to doubt the quality of his work.

The Schedule C for Washington Car's 2000 tax year reported sales of $118,900, and aggregate expenses of $92,892. But Spiller got his signs confused and reported the difference as a net loss. The Commissioner's service center noticed the math error, made the appropriate correction, and notified the Coxes that the resulting adjustments required them to pay tax due on the increase in taxable income, plus a penalty and interest. Spiller prepared and submitted an amended tax return on which the Coxes flipped the numbers from their original return, reducing

their reported sales to $92,892 and increasing their aggregate expenses to $118,900.  (Although Spiller entered $118,900 as the total expenses on line 28 of the amended Schedule C, the actual sum of expenses listed equals $119,042).  Remarkably--since Washington Car's business was buying cars to repair and resell--neither the original nor the amended Schedule C reported any cost of goods sold.  More remarkably, Spiller submitted a <u>second</u> amended 2000 return that reduced Schedule C sales to $92,500 and expenses to $118,508.  This time, Spiller inexplicably kept the prior net loss figure and claim of refund, and continued to report no cost of goods sold.

This was not a good tax preparation strategy.  The IRS audited the returns and rejected both the original and amended Forms 1040.  The resulting notice of deficiency included a penalty under section 6662[1] for negligence.  Before trial, Cox and the Commissioner stipulated that his gross receipts were actually about $258,000 and stipulated as well that he was entitled to deductions and allowances of about $130,000.  Left for trial were two issues:  the deduction of what Cox claimed were cash payments to Concord, and the penalty for negligence. The trial was in Houston, where the Coxes lived when they filed their petition.

---

[1] Unless otherwise stated, section references are to the Internal Revenue Code and regulations as amended and in effect for 2000.

## Discussion

A.  Allowability of cash payments

It's easy to see why the Commissioner questioned Cox's claim that he routinely made cash purchases from Concord.  Not only was the amount involved quite large, but the most common way Cox got cash was by writing checks to himself or his wife drawn on the Washington Car Care account.  Cox's general ledger from 2000 lists dozens of such checks recorded as a debit to "Purchases", which was Washington Car's cost-of-goods-sold account.  He cashed many of these checks at local grocery or convenience stores.  This pattern raised the Commissioner's suspicion that business accounts were being used for personal expenses.

The Commissioner's counsel vigorously grilled Cox on these points at trial, and hammered away especially hard at his failure to produce business records to support his claims.  But Cox's story held up--with an honest demeanor, no hesitation, and perfect reasonableness, he explained both the absence of records and his own check-cashing habits.

He credibly explained that he kept most of his business receipts and records stuffed in duffel bags, which he stored in a loft above his repair shop.  He also credibly testified that he was in the habit of employing recently released prisoners, encouraged in part to do so by his father, a retired sergeant in the county sheriff's office.  Washington Car's records went

missing in 2002, and Cox convinced us that one of his evidently not-quite-rehabilitated employees stole one of the duffels, no doubt thinking it contained cash instead of canceled checks, receipts, and bank statements. (That employee disappeared shortly thereafter.) It was also about this time that Spiller died after heart surgery, preceded by what Cox thought to be a serious (and probably illegal substance-related) illness, leaving him without his long-time accountant when the IRS began its audit. Cox quickly did the right thing and hired a new accountant, Katie Beal, to help recreate his business records. Beal had few of the original receipts, and none of the checks or bank records to review, as they had been in the stolen duffel bag. But her careful piecing together of the available information corroborates Cox's story.

We conclude that the records really were stolen. Cox credibly explained the circumstances regarding their disappearance: it is quite believable that an ex-convict who had access to the area where most of the records were kept might take the duffel bags thinking there was more in them than just records. And what written evidence exists supports Cox's story. He had kept the general ledger for Washington Car upstairs at his shop, and Beal and he got copies from the bank of the statements that had been stolen. Our close side-by-side scrutiny of those statements and the general ledger shows that the ledger

reasonably matches the statements for those purchases Cox made from Concord by check. (And the Commissioner has conceded those expenses.) We infer from that that the ledger is accurate when it shows that cash--even cash obtained by cashing checks at grocery stores and gas stations--was going to Concord on a regular basis to pay for cars. Cox also insisted the owners of Concord give him receipts, and he kept them too--fortunately not stuffing them into the missing duffel bag. Those receipts also match--not perfectly, but in more than enough instances for us to believe that the ledger and remaining records are legitimate.

Cox also credibly explained why he didn't just write checks to Concord. As he told it, his relationship with Concord had begun with his making payments by check, but there were times that his business account had insufficient funds, or at least insufficient collected funds, to make the checks good. This made Concord's owners leery of accepting his checks and for most of 2000 they demanded that he pay cash, accepting checks only occasionally when he warned them that he was short, and they agreed to hold off presenting them for payment. And the existing documents also show combinations of checks to Concord and cash payments totaling about $2000/week, which corroborates Cox's testimony.

Cox also credibly explained his practice of cashing checks made out to himself or his wife--he did so because Spiller

advised him to create a paper trail of the cash withdrawals that he was using to pay Concord. (We note that cashing checks at other merchants, with whom he did not have an ongoing business relationship, would both delay their presentment for payment and not immediately result in the repossession of any of his inventory if they bounced.)

So we find that Cox is entitled to a deduction for his cash expenses. The parties did not stipulate the precise amount at stake, but they did stipulate that Washington Car (or the company's sometime alter ego, Washington Car Rental) had receipts for payments totaling $76,600 from Washington Car Care. Two additional receipts show payments from Concord to Washington Car of $10,000; however, Cox testified at trial that he mistakenly switched the names of the companies on the "to" and "from" lines, and that Concord never made any refund payments to the Company. We believe Cox's testimony that these receipts were actually for payments made to Concord. Therefore, the total amount of the purchases from Concord is $86,600, of which $16,100 was paid by check. Because the Commissioner has already conceded the $16,100 paid by check, we hold that Cox should be allowed an additional $70,500 deduction for cash purchases as a cost of goods sold.

B.   Section 6662 Penalty

The only other issue for us to decide is whether the Coxes are liable for an accuracy-related penalty. In his notice of

deficiency, the Commissioner does not specify why he imposed the penalty, but there are only two possibilities: (1) negligence; or (2) a substantial understatement.

Part of this penalty will disappear with the portion of the underpayment traceable to the cash purchases that we have allowed. Section 6664 may provide a defense to the remainder-- under either the negligence or substantial understatement theory--"if it is shown that there was a reasonable cause * * * and that the taxpayer acted in good faith." Sec. 6664(c)(1). The regulations issued under this section require that our analysis be conducted "on a case-by-case basis, taking into account all pertinent facts and circumstances." Sec. 1.6664-4(b), Income Tax Regs.

The crucial fact here is that the Coxes relied in good faith on Spiller to correctly prepare their tax return based on the financial records and receipts they gave him. This was reasonable--he was a former IRS auditor, and had competently done their taxes in the past before his evidently rapid decline and death. While a taxpayer cannot hide behind a tax preparer or adviser, we have often held that a taxpayer who supplies his preparer with accurate information relating to the return is not negligent in relying upon the preparer's advice. Kurzet v. Commissioner, T.C. Memo. 1997-54, affd., revd., and remanded on other issues, 222 F.3d 830 (10th Cir. 2000). We do not fault the Coxes for the errors on their return when the mistakes stemmed

from their accountant's lack of professional care.  <u>Reinhardt v. Commissioner</u>, T.C. Memo. 1993-397 (no negligence when an "incorrect return is the result of the preparer's mistakes").  We also take into account the Coxes' educational and business experience.  See <u>Pratt v. Commissioner</u>, T.C. Memo. 2002-279.  The trial showed that Cox, though gifted in his field, knew little of accounting.  Such men should especially be able to rely on a preparer if they give him their business records, holding no information back, as we specifically find that he did.  Given Cox's genuine lack of knowledge of accounting, we do not construe his actions as constituting negligence or disregard of tax law.  See <u>Neely v. Commissioner</u>, 85 T.C. 934, 947-48 (1985).

To reflect the settlement of the other issues in this case,

<u>Decision will be entered under Rule 155</u>.