IN THE OREGON TAX COURT
MAGISTRATE DIVISION
Income Tax

STEVEN K. FLANAGAN )
and SANDRA M. FLANAGAN, )
)
      Plaintiffs, ) TC-MD 140293N
)
      v. )
)
DEPARTMENT OF REVENUE, )
State of Oregon, )
)
      Defendant. ) **FINAL DECISION**

This Final Decision incorporates without change the court's Decision, entered

February 24, 2015. The court did not receive a statement of costs and disbursements within 14

days after its Decision was entered. See TCR-MD 16 C(1).

Plaintiffs appeal Defendant's Conference Decision and Notice of Deficiency Assessment

dated March 11, 2014, for the 2009 tax year. A trial was held in the Oregon Tax Courtroom on

December 10, 2014, in Salem, Oregon. Robert S. Quinney, attorney at law, appeared on behalf

of Plaintiffs. Steven K. Flanagan (Steven) and Sandra M. Flanagan (Sandra) testified on behalf

of Plaintiffs.[1] Dane Palmer (Palmer), tax auditor, appeared on behalf of Defendant. Plaintiffs'

Exhibits 1 through 33 were received without objection. Defendant's Exhibits A through O were

received without objection.

## I. STATEMENT OF FACTS

Plaintiffs appeal Defendant's Conference Decision dated March 11, 2014, specifically

Defendant's denial of Plaintiffs' claimed Schedule C business expenses, Plaintiffs' Schedule F

---

[1] When referring to a party in a written decision, it is customary for the court to use the last name. However, in this case, the court's Decision recites facts and references to two individuals with the same last name, Flanagan. To avoid confusion, the court will use the first name of the individual being referenced.

farm loss, Plaintiffs' claimed theft loss, and the substantial understatement of income penalty. (*See* Ptfs' Compl at 3; Ptfs' Trial Mem.) Steven testified that, as of 2009, Plaintiffs did not have separate bank accounts for their businesses.

A.      *Sandra's Nurse Consulting Business*

Sandra testified that she is a registered nurse and has some management experience. (*See* Ptfs' Ex 1 (Sandra's resume).) She testified that her occupation has been "RN Consultant, LLC," since 2002. (*See id.* at 1.) Sandra's resume describes "RN Consultant, LLC" as,

> "Private consultant * * * for Adult Foster Care Homes specializing in care for the developmentally delayed and intellectually delayed clients, providing: Complex client assessments for medically complex/frail clients. Plans of Care, delegation of complex nursing tasks, teaching and procedural guidance on routine tasks and completion of forms and documentation of hours as needed by State regulations and as per State RN contract."

(*Id.*) Sandra testified that, before 2009, she worked in Portland and maintained an office in Plaintiffs' Portland home. (*See id.*) She testified that, in 2009, she continued to consult with clients in Portland, but also obtained a state contract in Lane County and opened an office there. (*See id.*) Sandra testified that, in 2009, Plaintiffs owned a property in Junction City, Oregon and she used a house on Steven's mother's property as her office in Lane County. She testified that she kept her files at that property, which was a few miles from Plaintiffs' Junction City house.

1.      *Mileage*

On their 2009 Schedule C for Sandra's business, Plaintiffs claimed a car and truck expense of $4,787 based on 9,633 miles driven for business purposes. (Def's Ex C at 7; Ptfs' Ex 4 at 1.) Sandra testified that she traveled frequently for work in 2009 because she had clients in both Eugene and Portland. She testified that Steven created mileage logs for her about once per week based on her appointment books. (*See* Ptfs' Ex 4 (mileage log).) Steven testified that he would use the website MapQuest to determine Sandra's mileage for each trip. Sandra brought

her appointment books to trial, but testified that she could not provide them to Defendant and the court due to HIPAA rules protecting patient privacy. Similarly, she testified that she could not provide her date- and time-stamped client files because of HIPAA.

The first page of Sandra's mileage log states "all trips are for consulting[;] all trips start from office[;] office is 7603 SW 51st Ave Portland or 92023 Purkerson Rd Junction City[.]" (Ptfs' Ex 4 at 1.) The log lists the date of travel, the destination, and the miles driven. (*See generally* Ptfs' Ex 4.) The beginning odometer reading as of January 1, 2009, was recorded in the log as 35,345 and the ending reading as of December 31, 2009, was 44,978. (*Id.* at 2, 13.) Sandra testified that Plaintiffs determined 983.6 miles were personal, so they revised her total business miles from 9,632.6 to 8,649.0. (*See id.* at 1.)

Defendant disallowed Sandra's mileage based on lack of substantiation. (*See* Ptfs' Ex 9 at 7.) At trial, Defendant pointed out that the difference between Sandra's odometer readings is 9,633 miles, which is the total business miles originally reported. (*See* Ptfs' Ex 4.) Additionally, the reported business trips total 9,632.6 miles. (*See id.*) Defendant questioned Steven about how the 983.6 personal miles were calculated, but he could not provide an explanation. Defendant also questioned Steven about the lack of recorded trips between Eugene and Portland. (*See, e.g.,* Ptfs' Ex 4 at 2 (Jan 19 entry was a Portland address, but no entry recording drive to Portland).)

2. *Office Expenses*

On their 2009 Schedule C, Plaintiffs claimed an office expense of $5,856 for Sandra's consulting business. (Def's Ex C at 7.) Of that amount, $5,240 remains at issue. (Ptfs' Trial Mem at 2.) Steven testified that Sandra's office in Junction City was formerly a one-bedroom house that Plaintiffs converted to an office. He testified that it was not possible, as of 2009, to receive internet at their home, so Sandra needed a separate office. Sandra testified that she

conducted professional trainings out of the Junction City office and wanted to offer a professional space to meet with people. She testified that the Junction City office used to be a "pig house" and it was a "pretty primitive building" with a "retro installed pellet stove" and lighting. Sandra testified that she needed nicer furniture to cover the walls and improve the appearance. She testified that she also needed furniture to store files, boxes of papers, books, training materials, office supplies, and tea and coffee cups. Sandra testified that she was required to create and retain many documents as part of her work. She testified that, in addition to the furniture purchased in 2009, she utilized chairs, couches, and some furniture that Plaintiffs already owned.

Plaintiffs provided receipts for Sandra's office expenses, which included doors, a cabinet, a desk, a work table, a lamp, and office decor.[2] (*See* Ptfs' Ex 5 at 1-5.) Steven testified that he thought Defendant allowed the receipts for the desk lamp and décor, totaling $615.83. (*Id.* at 2-4.) Plaintiffs provided a $3,700 receipt dated "11/7/09" for doors and a cabinet. (*Id.* at 1.) The receipt stated it was the first of three installments. (*Id.*) Steven testified that he could not recall when Plaintiffs paid the balance on that purchase. Plaintiffs provided a $558 receipt dated "08/05/2009"from Junction City 2nd Hand; a handwritten note states "work table" and "desk." (*Id.* at 5.) Steven testified that receipt was for a table for Sandra's Junction City office. Plaintiffs provided a $1,200 receipt dated "Oct 6, 08" from Will Grant for an "Antique Kitchen Cupboard." (*Id.*) Steven testified that the receipt was for more office storage and the cupboard was put into service in 2009 despite the 2008 purchase date.

/ / /

---

[2] Plaintiffs also provided several receipts from The Home Depot and A-Boy Supply Co., Inc., but Steven testified that those receipts were related to repairs and maintenance at Sandra's Portland office and were not included in Plaintiffs' claimed office expense. (*See* Ptfs' Ex 5 at 6-9.)

3. *Supply Expenses*

On their 2009 Schedule C, Plaintiffs claimed a supply expense of $3,972 for Sandra's consulting business. (Def's Ex C at 7.) Defendant disallowed 50 percent of Plaintiffs' claimed supply expenses because "[t]he notations on the receipts were not contemporaneous, but created years after the fact." (Ptfs' Ex 9 at 7.) At trial, Palmer stated that he only allowed 50 percent of Sandra's claimed expenses based on his conclusion that Sandra was not using the Portland office for business purposes.

Plaintiffs provided receipts for purchases, including paper, envelopes, chart dividers, printer ink, various computer supplies, a phone, PO Box rental, postage, and parking. (Ptfs' Ex 7.) Steven testified that Plaintiffs paid $532.57 to ADT Security in 2009 for Sandra's Portland office. (*See id.* at 1, 35-37 (alarm services contract, monthly payment).) Plaintiffs' receipts include handwritten notes identifying the business purpose of each purchase. (*See* Ptfs' Ex 7.) Steven testified that he added those notes at some point during the audit. Defendant questioned how Plaintiffs could know that expenses were for business rather than personal purpose noting, for example, Plaintiffs' claimed expenses for postage. (*See id.* at 25-26, 28-29.) Steven testified that he knew those postage expenses were for Sandra's business because he put the receipts in that file and because Plaintiffs did not have any personal postage expenses.

4. *Rent*

On their 2009 Schedule C, Plaintiffs claimed a business property rent expense of $3,972 for Sandra's consulting business. (Def's Ex C at 7.) In its conference decision, Defendant disallowed Plaintiffs' claimed rent expense because "[r]elated-party transactions require greater scrutiny than other transactions." (Ptfs' Ex 9 at 7.) Sandra testified that Plaintiffs paid Steven's mother $250 per month in 2009 to rent the Junction City house that she used as an office. (*See*

Ptfs' Ex 6 (receipts).)  Plaintiffs provided a signed, handwritten note dated January 1, 2009, which states, "Steven Flanagan agrees to pay 250- per month for the house 92051 Purkerson Rd. to use as office only." (*Id.* at 1.)  Plaintiffs provided 10 receipts reporting cash payments of $250 on or close to the first of each month in 2009. (*See id.* at 1-3.)  One receipt, dated "Aug-Sept 1, 2009" reported a cash payment of $500.  (*Id.* at 2.)  Defendant questioned why Plaintiffs paid Steven's mother in cash, noting that they paid her by check for utilities.[3]  Sandra testified that Steven's mother preferred to receive cash because she lives in the country and it is burdensome to travel to the bank.  Steven testified that receiving cash "seemed to make her happy."

B.      *Steven's Contracting Business*

On their 2009 Schedule C for Steven's general contractor business, Plaintiffs claimed total expenses of $1,867.  (Def's Ex C at 5.)  Defendant allowed Steven's mileage expense of $639 and disallowed the remainder of claimed expenses based on inadequate substantiation. (Ptfs' Ex 9 at 8.)  Steven testified that he had been working on higher end vintage homes for four to five years, but the economy declined in 2009 and he stopped getting jobs.  He testified that he had insurance, bonding, and licensing as of 2009, but could not find any supporting documents. Steven provided an invoice from Papé Material Handling for $345.55 dated 9/19/07; an illegible delivery order from Airgas; and several additional receipts.  (Ptfs' Ex 9B at 4-10.)

C.      *Plaintiffs' Farming Activity*

On their 2009 Schedule F, Plaintiffs claimed a net loss of $55,278 from farming.  (Def's Ex C at 9.)  Defendant disallowed the farm loss based on its determination that Plaintiffs did not engage in the farming activity with a profit motive.  (Ptfs' Ex 9 at 6.)  Alternatively, Defendant

/ / /

_____

[3] The parties confirmed at trial that Defendant allowed Plaintiffs' claimed expenses for utilities, so those are not at issue before the court.

concluded that many of Plaintiffs' farm expenses were not adequately substantiated. (*See id.*; Ptfs' Ex 9A at 8-11 (auditor's report).)

Steven testified that Plaintiffs purchased a 41-acre property located on Kirk Road in Junction City Oregon in 2006 for $349,900. (*See* Ptfs' Ex 16 (deed).) Steven testified that, during the audit, Plaintiffs created a business plan that discussed potential farm income sources, including lamb, duck eggs, goat milk, and forestry products. (*See* Ptfs' Ex 10 at 2.) The plan stated that Plaintiffs "anticipate having 60 lambs to market each year." (*Id.*) Based on a "[r]etail price for local natural lamb [of] $10.00/pound," Plaintiffs anticipated "$31,200.00, gross annually." (*Id.*) It stated that their "goal is to keep 40 hens that will produce 833 dozen [eggs], annually. The wholesale price to an egg handler for 833 dozen eggs at $3.50/dozen is $2,916.00, annually." (*Id.*) Plaintiffs anticipated a second harvest of "4,455 board feet" of timber that could be sold for $2,584 based on 2012 pricing. (*Id.*) Steven testified that Plaintiffs anticipated selling wool to "spinners" for yarn at the going rate of $30 per sheep.

Steven testified that his family has lived in Junction City for about 100 years and that he has some experience with his family's sheep farm and dairy operations:

> "As a teen, [he] worked for Flanagan Farms, Inc, a several thousand-acre farm that * * * remains operational in Junction City. Flanagan Farms, Inc introduced some of the best sheep genetics in the 70's that continues to populate this valley. * * * In his youth, Flanagan Farms, Inc also operated a 200-cow dairy in which Steven participated."

(Ptfs' Ex 10 at 1.) Steven wrote that he "competed a 2-year course in 'Classical Equine Training': husbandry, management and care." (*Id.*) He testified that, in total, he worked on farms for about 10 to 12 years. Steven testified that he worked as a union carpenter for a long time and he previously worked for the US Forest Service. (*See id.*) Steven testified that he talked with his family members about sheep farming when he started Plaintiffs' farm.

Steven testified that farming is seasonal but, on average, he works about 40 hours per week on the farm. He testified that sheep farming is not recreational like owning horses and participating in dressage. Plaintiffs provided a summary of work on the farm each year from 2006 through 2012. (Ptfs' Ex 11.) In 2006, Plaintiffs removed trash, debris, and blackberries from the property, "[m]ow[ed] egress routes in upper pastures," and "[s]eed[ed] cleared areas with fescue and orchard grass to prevent erosion[.]" (*Id.* at 1.) In 2007, Plaintiffs seeded the upper and lower pastures, began the barn repair, spread manure, and installed pasture gates. (*Id.*) In 2008, Plaintiffs "[c]ompleted grinding of east pasture[,] [p]unched into the west pasture[,]" replaced fence posts, worked on the barn, and built a "duck/chicken coop & yard[.]" (*Id.*) In 2009, Plaintiffs repaired road access to upper pastures, repaired ponds, mowed the upper pastures, gathered and disposed of wood debris, repaired the barn, "[l]imb[ed] 2nd growth trees[,]" built "panels for barn lambing pens[,]" repaired a water line, and "[m]illed barn wood siding to match existing[.]" (*Id.* at 1-2.)

Steven testified that Plaintiffs periodically placed signs on their property advertising farm products for sale when they had something specific to sell and were around to receive customers. (*See* Ptfs' Ex 14A (photo of signs).) He testified that Plaintiffs sold eggs wholesale to an "egg handler." Steven testified that he did not sell any wool in 2009, but had as of December 2012. He testified that he used wool as liners for planters. Steven testified that he has thinned and maintained the timber on Plaintiff's property. (*See* Ptfs' Ex 12 (aerial photographs of Plaintiffs' property showing growth of trees and clearing of pasture).) He testified that he learned "timber cruising" when he worked for the Forest Service and he completed his own valuation of the Plaintiffs' timber using that knowledge. Steven provided a copy of his timber value estimate, reporting an increase in the value of Plaintiffs' timber from $7,178 in 2006 to $87,166 in 2013.

(*See* Ptfs' Ex 18 (Steven's timber value estimate for Plaintiffs' property); *see also* Ex 13 at 1 ("tree tally sheet" showing the tree species and numbers on Plaintiffs' property as of January 2014).) Steven testified that he received a comparative market analysis from a licensed real estate broker valuing Plaintiffs' property at $361,500 in 2014. (*See* Ptfs' Ex 17.)

Plaintiffs reported the following farm profit and losses from 2006 through 2009:

|      | Reported Gross Receipts | Profit (Loss) |
|------|-------------------------|---------------|
| 2006 | $1,975                  | ($15,906)     |
| 2007 | $5,213                  | ($21,401)     |
| 2008 | $26,666                 | $602          |
| 2009 | ($4,365)                | ($55,278)     |

(Ptfs' Ex 9 at 19; Ex 21 at 1.) Steven testified that Plaintiffs invested in farm equipment in 2009 and used IRC section 179 to deduct most of the costs. He wrote "[d]epreciable equipment shouldn't be considered a loss at this time. My expectation is that farm equipment will have a life of [at] least 15 years, and still have a significant resale value at that point." (Ptfs' Ex 21 at 1.)

Steven testified that, as of the date of trial, Plaintiffs had 120 sheep and 20 duck hens. He testified that Plaintiffs previously had more ducks, but they were killed by eagles. Steven testified that the sheep were doing well and Plaintiffs were tracking the genetics of their flock using ear tags. (*See* Ptfs' Ex 14 at 3-5 (photos of sheep and lambs with ear tags).)

Steven testified that it takes time to create a profitable business, noting that Sandra's consulting business reported losses and small profits in its first six years before becoming significantly more profitable in 2009. (*See* Ptfs' Ex 20 (Plaintiffs' "income summary" from 2003 through 2013).) Steven testified that, at the time Plaintiffs began farming in 2006, Sandra was not making any money from her consulting business and Plaintiffs did not know that Sandra

/ / /

would receive the State of Oregon contract. (*See id.* (Sandra had $-0- income in 2006).) Steven testified that Sandra received approximately $112,000, gross, from her business in 2009.

D.      *Substantiation of Farm Expenses*

On their 2009 Schedule F, Plaintiffs claimed total farm expenses of $50,913, including: $1,485 for car and truck expenses; $6,678 for custom hire; $31,203 for depreciation; $645 for feed; $1,438 for gasoline, fuel, and oil; $3,682 for repairs and maintenance; and $2,872 for supplies. (Def's Ex C at 9.) Plaintiffs now request an expense of $9,908 for custom hire based on the total amount paid for dredging in 2009. (Ptfs' Pretrial Mem at 7.)

1.      *Mileage*

Steven provided mileage logs for a Toyota Land Cruiser and an Isuzu NPR. (Ptfs' Ex 23.) The mileage logs report 863 business miles in the Toyota Land Cruiser and 1,845 business miles in the Isuzu NPR, for a total of 2,708 miles. (*See id.*) Plaintiffs conceded that the mileage logs were not kept contemporaneously, but assert "[t]hat is no longer a requirement." (Ptfs' Trial Mem at 6; Ex 22.) The trips reported for the Toyota Land Cruiser were primarily to Jerry's Coastal Eugene, feed and supply stores, and other stores. The trips reported for the Isuzu were primarily to pick up or drop off eggs, feed, farm equipment, sheep, and parts. (*See* Ptfs' Ex 23.)

2.      *Custom Hire*

Steven testified that Plaintiffs paid to dredge out existing ponds on the farm property and to mow the fence line. (*See* Ptfs' Ex 24.) He testified that Plaintiffs had to "remove silt" from the ponds to "repair" them. (*See id.* at 5-7 (photos of ponds).) Plaintiffs provided two receipts from June and July 2009, totaling $9,907.50. (*Id.* at 1-4.) Plaintiffs provided an excerpt from IRS Publication 225 "Farmer's Tax Guide" stating that " 'the regular removal of sediment from a drainage ditch' may be deducted as an ordinary and necessary farm expense." (*Id.* at 9, 15-16.)

3. *Depreciation*

Steven provided Plaintiffs' farm depreciation schedule and supporting documents. (Ptfs'

Exs 25, 25A.) Plaintiffs "agree[d] that the cost of the John Deere [4200[4]] should be reduced to

$13,000 and they [could not] find the invoices for the cable type drilling rig ($5,500) or the fire

suppression trailer ($700)." (Ptfs' Pretrial Mem at 7.) Steven testified that Defendant agreed

that Plaintiffs provided adequate substantiation for: the John Deere hay bailer ($1,450); the John

Deere haybine ($1,500); and the hay rake ($3,250). (*See* Ptfs' Ex 25 at 1.) He testified that

Plaintiffs provided receipts for the Isuzu NPR truck ($16,000); the Peterbuilt dump truck

($3,995); the band saw mill ($5,000); and the overhead saw mill ($4,200). (Def's Ex H at 22;

Ptfs' Ex 25A at 4-5, 17.) Steven testified that he used the dump truck to haul manure, gravel,

and dirt. (*See* Def's Ex O at 25-26 (photos).) He testified that he used the saw mills for barn

repair and building items for the farm, such as sheep feeders.

4. *Other Farm Expenses*

Steven provided documents to support Plaintiffs' claimed farm expenses for feed; gas,

fuel, and oil; repairs and maintenance; and supplies. (*See* Ptfs' Ex 26-29.)

E. *Plaintiffs' Claimed Theft Loss*

In its conference decision, Defendant wrote "[a] currency basket investment of $28,495

was written off through [Plaintiffs'] UBS Financial Services Inc. account in 2009. This was the

result of a Lehman Brothers investment." (Ptfs' Ex 9 at 9.) Plaintiffs claimed the amount as a

theft loss. (*See id.*) Defendant "agree[d] that [it] was a loss in 2009[,]" but determined it was "a

long-term capital loss, subject to the limitations associated with long-term capital losses." (*Id.*)

/ / /

---

[4] Plaintiffs corrected their written statement at trial: it should have been "4200", not "450."

Defendant noted that Plaintiffs had "already reached [their] maximum long-term capital loss deduction for 2009[,]" but could carry the loss forward to future years. (*Id.*)

Plaintiffs assert that their loss was due to "a fraudulent investment scheme with no reasonable prospect of recovery in 2009, which qualifies as a theft loss under IRC § 165." (Ptfs' Ex 30 at 1.) Plaintiffs wrote that

> "[t]he currency basket investment at issue was part of the larger [UBS]/Lehman Brothers investment schemes that resulted in FINRA fining [UBS] $2.5 million dollars for misleading investors, a $120 million dollar settlement for Lehman securities that [UBS] underwrote and sold in violation of the Securities Act of 1933 and the Securities Act of 1934, and an $885 million accord with the U.S. Federal Housing Finance Agency for misrepresenting the quality of mortgage securities it sold to Fannie Mae and Freddie Mac in 2013."

(*Id.* at 1.)

## II. ANALYSIS

"The Oregon Legislature intended to make Oregon personal income tax law identical to the Internal Revenue Code (IRC) for purposes of determining Oregon taxable income, subject to adjustments and modifications specified in Oregon law." *Ellison v. Dept. of Rev.*, TC-MD 041142D, WL 2414746 at *6 (Sept 23, 2005), citing ORS 316.007.[5] As a result, the legislature adopted, by reference, the federal definition for deductions, including those under IRC section 162 for trade or business expenses. The code and regulations preclude deductions "for expenses incurred in connection with activities which are not engaged in for profit[,]" except as provided in section 183. Treas Reg § 1.183-2(a).

IRC section 162(a) allows a deduction for "all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business[.]" To be "ordinary," "the transaction which gives rise to [the expense] must be of common or frequent occurrence in

---

[5] The court's references to the Oregon Revised Statutes (ORS) are to 2007.

the type of business involved." *Deputy v. DuPont*, 308 US 488, 495, 60 S Ct 363, 84 L Ed 416 (1940), citing *Welch v. Helvering* (*Welch*), 290 US 111, 114, 54 S Ct 8, 78 L Ed 212 (1933). A "necessary" expense is one that is "appropriate and helpful" to the taxpayer's business. *See Welch*, 290 US at 113. Allowable deductions from taxable income are a "matter of legislative grace" and the burden of proof is placed on the individual claiming the deduction. *INDOPCO, Inc. v. Comm'r*, 503 US 79, 84, 112 S Ct 1039, 117 L Ed 2d 226 (1992) (citations omitted).

"Taxpayers are required to maintain records sufficient to substantiate their claimed deductions." *Gapikia v. Comm'r*, 81 TCM (CCH) 1488, WL 332038 at *2 (2001). Generally, if a claimed business expense is deductible, but the taxpayer is unable to substantiate it fully, the court is permitted to make an approximation of an allowable amount. *Cohan v. Comm'r* (*Cohan*), 39 F2d 540, 543-44 (2nd Cir 1930). The estimate must have a reasonable evidentiary basis. *Vanicek v. Comm'r*, 85 TC 731, 743 (1985). IRC section 274(d) supersedes the *Cohan* rule and imposes more stringent substantiation requirements for travel, meals, entertainment, gifts, and listed property under IRC section 280F(d)(4)(A)(i). Treas Reg § 1.274-5T(a). Under IRC section 274(d), a taxpayer must substantiate a claimed expense with adequate records or sufficient evidence corroborating the taxpayer's statement establishing the amount, time, place, and business purpose of the expense. Treas Reg § 1.274-5T(b).

As the party seeking affirmative relief, Plaintiffs bears the burden of proof by a preponderance of the evidence. ORS 305.427. A "[p]reponderance of the evidence means the greater weight of evidence, the more convincing evidence." *Feves v. Dept. of Revenue*, 4 OTR 302, 312 (1971). "[I]f the evidence is inconclusive or unpersuasive, the taxpayer will have failed to meet his burden of proof * * *." *Reed v. Dept. of Rev.*, 310 Or 260, 265, 798 P2d 235 (1990). In an income tax appeal, this court has statutory authority "to determine the correct amount of

[the] deficiency, even if the amount so determined is greater or less than the amount of the assessment determined by the Department of Revenue[.]" ORS 305.575.

A.    *Sandra's Nurse Consulting Business*

    1.    *Mileage*

Mileage is subject to the strict substantiation requirements of IRC section 274(d) and the accompanying regulations. "The elements to be provided with respect to an expenditure for travel away from home are" the amount, time, place, and business purpose. Treas Reg § 1.274-5T(b)(2). "Except as otherwise provided in this section and § 1.274-6T, a taxpayer must substantiate each element of an expenditure or use * * * by adequate records or by sufficient evidence corroborating his own statement." Treas Reg § 1.274-5T(c)(1). "To meet the 'adequate records' requirements of section 274(d), a taxpayer shall maintain an account book, diary, log, statement of expense, trip sheets, or similar record * * * and documentary evidence * * * which, in combination, are sufficient to establish each element of an expenditure or use specified in paragraph (b) of this section." Treas Reg § 1.274-5T(2)(i).

> "[T]he probative value of written evidence is greater the closer in time it relates to the expenditure or use. A contemporaneous log is not required, but a record of the elements of an expenditure * * * made at or near the time of the expenditure or use, supported by sufficient documentary evidence, has a high degree of credibility not present with respect to a statement prepared subsequent thereto when generally there is a lack of accurate recall."

Treas Reg § 1.274-5T(c)(1). "[A] log maintained on a weekly basis * * * shall be considered a record made at or near the time of such use." Treas Reg § 1.274-5T(c)(2)(ii).

/ / /

/ / /

/ / /

/ / /

"If any information relating to the elements of an expenditure or use, such as place, business purpose, or business relationship, is of a confidential nature, such information need not be set forth in the account book, diary, log, statement of expense, trip sheet, or similar record, provided such information is recorded at or near the time of the expenditure or use and is elsewhere available to the district director to substantiate such element of the expenditure or use."

Treas Reg § 1.274-5T(c)(2)(ii)(D).

Sandra's mileage log includes the requisite elements of amount, time, and place. It does not include business purpose, but that was provided by her testimony. Defendant disallowed Sandra's mileage log in part based on its determination that the log was "not kept completely contemporaneously." (Ptfs' Ex 9 at 7.) However, Sandra testified that Steven created mileage logs for her about once per week, which satisfies the requirement that records be made "at or near the time of the expenditure or use." Treas Reg § 1.274-5T(c)(2)(ii). Sandra testified that her appointment books and client files substantiate her claimed mileage, but she could not provide those records to Defendant or the court due to HIPAA confidentiality. Under Treasury Regulation section 1.274-5T(c)(2)(ii)(D), confidential information need not be set forth in the taxpayer's mileage log. The court's concern with Sandra's mileage log is that it contains unexplained discrepancies. The odometer readings reported suggest that Sandra's vehicle was used 100 percent for business in 2009. Plaintiffs conceded that was incorrect and they determined 984 miles were personal, but did not explain how that determination was made or which recorded trips were, in fact, personal. The court does not doubt that Sandra was required to travel for her business, but the court is unable to determine her 2009 mileage based on the evidence presented.

2.  *Office Expenses*

At trial, Defendant questioned the reasonableness of the amount paid for several of Sandra's office expenses, including the doors and cabinet purchased for $3,700.

"For an expense to be considered ordinary and necessary, it must also be reasonable in amount." *Kurzet v. Comm'r*, 222 F3d 830, 834 (10th Cir 2000); *see also U.S. v. Haskel Engineering & Supply Co.*, 380 F2d 786, 788-89 (9th Cir 1967) ("An expenditure may be, by its nature, ordinary and necessary, but at the same time it may be unreasonable in amount. In such a case only the portion which was reasonable would qualify for a deduction under § 162(a)"). "[T]he question of whether expenses are reasonable" is "a factual question[.]" *See Kurzet*, 222 F3d at 834-36 (concluding that the taxpayers' expenses associated with operating their Lear jet to travel to their Oregon timber farm were reasonable); *see also Palo Alto Town & Country Village, Inc. v. Comm'r*, 565 F2d 1388, 1390-91 (9th Cir 1977) (allowing expense of maintaining an airplane on a standby basis as an "ordinary and necessary" business expense).

> "In determining that which is 'necessary' to a taxpayer's trade or business, the taxpayer is ordinarily the best judge on the matter, and we would hesitate to substitute our own discretion for his with regard to whether an expenditure is 'appropriate and helpful,' in those cases in which he has decided to make the expenditure solely to serve the purposes of his business."

*Henry v. Comm'r*, 36 TC 879, 884 (1961).

Sandra testified that it was necessary for her to maintain an office because she conducted professional trainings and created extensive files. She testified that, because her office was in an old "pig house[,]" it was necessary to improve the appearance with nicer furniture and décor. The court finds that Sandra's expenses incurred for office furniture and décor were ordinary and necessary business expenses and were reasonable in amount. In addition to the $616 expense allowed by Defendant, the court finds that Plaintiffs have adequately substantiated an additional office expense of $4,258 for the 2009 tax year. The court finds that the $1,200 receipt from 2008 should not be allowed because it was not paid in 2008 and Plaintiffs provided no evidence to establish that the desk was placed in service in 2009 rather than in 2008.

3.  *Supplies*

After reviewing Plaintiffs' receipts and considering their credible testimony, the court finds that Plaintiffs have substantiated a supply expense of $3,725 for Sandra's business. The court disallowed payments for personal items (candy and a flu shot), illegible and un-itemized receipts, duplicate expenses, and a receipt dated in 2010. (*See* Ptfs' Ex 7 at 3-4, 6-8, 13, 23, 27, 31-32.) The court's supply expense allowance supersedes the unidentified supply expenses allowed by Defendant.

4.  *Rent*

"Transactions between related parties rightly generate heightened scrutiny, because of the increased potential for favorable treatment * * * and a greater motivation and willingness to testify untruthfully * * * about the amount (if any) actually paid. Nonetheless, related parties can, and do, deal at arm's-length." *Carter v. Dept. of Rev.*, TC-MD 080689C, WL 1351818 at *3 (Apr 30, 2009). Sandra's claimed rent payments were made in cash to a related party, but Plaintiffs substantiated the payments with signed receipts and their sworn testimony. The court found Plaintiffs to be credible and concludes that they should be allowed an expense of $2,750 for Sandra's office rent.

B.  *Steven's Contracting Business*

Plaintiffs provided little evidence and testimony related to Steven's contracting business. Plaintiffs provided some receipts for expenses, but did not identify the business purpose of those purchases through documentation or testimony. The court finds that Plaintiffs have failed to substantiate any additional expenses for Steven's contracting business in 2009.

/ / /

/ / /

C.    *Plaintiffs' Farming Activity*

Defendant disallowed Plaintiffs' Schedule F farm expenses based on its conclusion that Plaintiffs did not engage in the activity for profit and, in the alternative, because Plaintiffs did not provide adequate substantiation for their claimed expenses. (*See* Ptfs' Ex 9 at 6.)

1.    *Whether Plaintiffs' Farm Activity was Engaged in for Profit*

Defendant relied upon the nine factors set forth in Treasury Regulation 1.183-2(b) to evaluate whether Plaintiffs had a profit motive. (Ptfs' Ex 9 at 4-6.) Plaintiffs disagree that those factors are applicable and assert that the court should only look to court cases under IRC section 162. (Ptfs' Trial Mem at 2-3.) "The Treasury Regulations promulgated pursuant to § 183 establish an objective test for determining whether a taxpayer is engaging in an activity for profit." *Westbrook v. Comm'r*, 68 F3d 868, 875 (5th Cir 1995). Thus, the court concludes it is appropriate to consider the nine factors in Treasury Regulation section 1.183-2(b).

> "The determination whether an activity is engaged in for profit is to be made by reference to objective standards, taking into account all of the facts and circumstances of each case. Although a reasonable expectation of profit is not required, the facts and circumstances must indicate that the taxpayer entered into the activity, or continued the activity, with the objective of making a profit. * * * In determining whether an activity is engaged in for profit, greater weight is given to objective facts than to the taxpayer's mere statement of his intent."

Treas Reg § 1.183-2(a); *Comm'r v. Groetzinger*, 480 US 23, 35, 107 S Ct 980, 94 L Ed 2d 25 (1987) ("to be engaged in a trade or business, the taxpayer must be involved in the activity with continuity and regularity and [] the taxpayer's primary purpose for engaging in the activity must be for income or profit. A sporadic activity, a hobby, or an amusement diversion does not qualify"). "In determining whether an activity is engaged in for profit, all facts and circumstances with respect to the activity are to be taken into account. No one factor is determinative in making this determination." Treas Reg § 1.183-2(b).

a. The Manner in Which the Taxpayer Carries on the Activity

"The fact that the taxpayer carries on the activity in a businesslike manner * * * may indicate that the activity is engaged in for profit." Treas Reg § 1.183-2(b)(1). Under that factor, the court considers "(1) whether the taxpayer maintained complete and accurate books and records for the activity; (2) whether the taxpayer conducted the activity in a manner substantially similar to those of comparable activities that were profitable; and (3) whether the taxpayer changed operating procedures, adopted new techniques, or abandoned unprofitable methods in a manner consistent with an intent to improve profitability." *Giles v. Comm'r* (*Giles*), 89 TCM (CCH) 770 (2005), 2005 WL 375462 at *9 (US Tax Ct) (citation omitted); Treas Reg § 1.183-2(b)(1). "A written business plan is not required if the 'business plan was evidenced by * * * actions.' " *Betts v. Comm'r* (*Betts*), 100 TCM (CCH) 67 (2010), 2010 WL 2990300 at *6 (US Tax Ct) (citation omitted). In order to indicate a profit motive, the business plan should include "meaningful financial analysis." *Id.*

Plaintiffs provided some records, including a written business plan, receipts for expenses, a list of work completed on the farm, and Steven's valuation of Plaintiffs' timber. Plaintiffs' business plan discusses farm revenue sources and anticipated market prices for farm products. However, it was created during the audit and was not kept as a routine part of Plaintiffs' farming activity in 2009. If Plaintiffs maintained a ledger of farm income and expenses, it was not provided to the court. Plaintiffs paid farm expenses out of their personal accounts rather than through a separate account. That factor weighs against Plaintiffs.

b. The Expertise of Taxpayers or Their Advisors

"Preparation for the activity by extensive study of its accepted business, economic, and scientific practices, or consultation with those who are expert therein, may indicate that the

taxpayer has a profit motive where the taxpayer carries on the activity in accordance with such practices." Treas Reg 1.183-2(b)(2). Steven gained relevant experience from working on his family's sheep farm and other farms for 10 to 12 years. He acquired additional training from a two-year equine training course, his work as a carpenter, and his work for the Forest Service. That factor weighs in favor of Plaintiffs.

c.      The Time and Effort Expended

> "The fact that the taxpayer devotes much of his personal time and effort to carrying on an activity, particularly if the activity does not have substantial personal or recreational aspects, may indicate an intention to derive a profit. A taxpayer's withdrawal from another occupation to devote most of his energies to the activity may also be evidence that the activity is engaged in for profit."

Treas Reg 1.183-2(b)(3). As of 2009, Steven was winding up his general contractor business. Steven testified that he spent, on average, 40 hours per week working on the farm and provided a summary of work completed each year from 2006 to 2012. The work that Steven completed on the farm was not recreational; it included mowing, seeding pastures, spreading manure, and making repairs. That factor weighs in favor of Plaintiffs.

d.      Expectation that Assets May Increase in Value

> "[T]axpayer may intend to derive a profit from the operation of the activity, and may also intend that, even if no profit from current operations is derived, an overall profit will result when appreciation in the value of land used in the activity is realized since income from the activity together with the appreciation of land will exceed expenses of operation."

Treas Reg § 1.183-2(b)(4). However, "[f]arming and holding land will be considered a single activity only 'if the income derived from farming exceeds the deductions attributable to the farming activity which are not directly attributable to the holding of the land.' " *Betts*, 2010 WL 2990300 at *11, citing Treas Reg § 1.183-1(d)(1). Plaintiffs purchased the farm property for $349,900 in 2006 and received a comparative market analysis valuing the property at $361,500

in 2014, indicating an increase in its value over that time period. Steven estimated that the value of timber on the property increased from $7,178 in 2006 to $87,166 in 2013. Nevertheless, Plaintiffs' farm deductions exceeded farm income in each year from 2006 through 2009, except for 2008, therefore, any appreciation of Plaintiffs' land may not be considered as part of their farming activity in 2009. That factor is neutral.

e.        Success in Carrying on Similar or Dissimilar Activities

"The fact that the taxpayer has engaged in similar activities in the past and converted them from unprofitable to profitable enterprises may indicate that he is engaged in the present activity for profit, even though the activity is presently unprofitable." Treas Reg § 1.183-2(b)(5). Plaintiffs provided no evidence that they engaged in similar activities in the past and converted them from unprofitable to profitable. That factor is neutral.

f.        History of Income or Losses

> "[W]here losses continue to be sustained beyond the period which customarily is necessary to bring the operation to profitable status such continued losses, if not explainable * * * may be indicative that the activity is not being engaged in for profit. If losses are sustained because of unforeseen or fortuitous circumstances which are beyond the control of the taxpayer, * * * such losses would not be an indication that the activity is not engaged in for profit."

Treas Reg § 1.183-2(b)(6). Plaintiffs reported farm losses in each year from 2006 through 2009, except for 2008. In 2008, Plaintiffs reported gross receipts of $26,666 and a profit of $602. No explanation was provided for Plaintiffs' profit in 2008. Plaintiffs reported their largest losses in 2009, due in part to purchases of farm equipment. Plaintiffs explained that they had anticipated maintaining a flock of 40 duck hens, but lost many of those ducks to eagles; as of the date of trial, Plaintiffs had only 20 duck hens. Overall, that factor weighs against Plaintiffs.

/ / /

/ / /

g.      Amount of Occasional Profits Earned

"An occasional small profit from an activity generating large losses, or from an activity in which the taxpayer has made a large investment, would not generally be determinative that the activity is engaged in for profit. However, substantial profit, though only occasional, would generally be indicative that an activity is engaged in for profit, where the investment or losses are comparatively small."

Treas Reg § 1.183-2(b)(7). Plaintiffs reported a small profit of $602 in the 2008 tax year, but have not reported any other profits. That factor weighs against Plaintiffs.

h.      Financial Status of the Taxpayers

"Substantial income from sources other than the activity (particularly if the losses from the activity generate substantial tax benefits) may indicate that the activity is not engaged in for profit especially if there are personal or recreational elements involved." Treas Reg § 1.183-2(b)(8). Sandra received gross income of $112,000 from her nurse consultant work in 2009. However, she received no income from that work in 2006 when Plaintiffs began farming and little income from that work in 2007 and 2008. That factor weighs in favor of Plaintiffs.

i.      Elements of Personal Pleasure or Recreation

"The presence of personal motives in carrying on of an activity may indicate that the activity is not engaged in for profit, especially where there are recreational or personal elements involved." Treas Reg § 1.183-2(b)(9). Steven testified that sheep farming is not recreational like owning horses or participating in dressage. As discussed above, the work that Steven completed on the farm was not recreational; it included mowing, seeding pastures, spreading manure, and making repairs. That factor weighs in favor of Plaintiffs.

Although the factors are split in this case, the court is persuaded by a preponderance of the evidence that Plaintiffs engaged in farming for profit in 2009. Plaintiffs undertook their farming activity at a time when they did not have significant other sources of income. They

pursued sheep farming, which is not typically considered a recreational activity. Steven spent significant time working on the farm and utilizing his prior experience and skills.

2. *Substantiation of Farm Expenses*

a. Mileage

As discussed above, mileage is subject to the strict substantiation requirements of IRC section 274(d). Although a mileage log need not be contemporaneous, entries should be made at or near the time of travel. A mileage log may also be substantiated by documentary evidence sufficient to establish each element: amount, time, place, and business purpose. Plaintiffs provided some receipts for farm expenses, but did not provide a key or table matching claimed mileage with receipts. Based on a review of the receipts provided, the court was unable to determine which claimed business trips are substantiated by supporting documents.[6] Plaintiffs have failed to adequately substantiate their claimed farm business mileage.

b. Depreciation

IRC section 167(a) allows as a depreciation deduction "a reasonable allowance for the exhaustion, wear and tear * * * of property used in the trade or business[.]" "The basis on which exhaustion, wear and tear, and obsolescence are to be allowed in respect of any property shall be the adjusted basis provided in section 1011[.]" IRC § 167(c)(1). IRC section 179 allows a taxpayer to elect to take certain capital expenditures as current expenses if the property qualifies under IRC section 179(d)(1). The court concludes that Plaintiffs should be allowed their claimed depreciation for the hay bailer, the haybine, the hay rake, the band saw mill, and the overhead saw mill, totaling $3,983. Plaintiffs adequately substantiated the cost basis of each of those items and explained its farm business purpose. Plaintiffs elected to deduct the full cost of the

---

[6] For example, Plaintiffs provided a receipt for bird seed purchased on December 23, 2009, yet no business trips are reported for December 2009. (Ptfs' Ex 26 at 5; Ex 23 at 10.)

Peterbuilt dump truck pursuant to IRC section 179, but they incorrectly reported the cost as $3,995 rather than $3,700; therefore, Plaintiffs' deduction for the dump truck is limited to $3,700. Plaintiffs are allowed a depreciation deduction of $783 for the John Deere tractor 4200, rather than the deduction of $1,813 that they claimed. The allowable deduction must be reduced because Plaintiffs erroneously reported its basis as $14,800, rather than $13,000.[7] Although Plaintiffs adequately substantiated the cost basis of the Isuzu NPR truck, the court concludes that no depreciation deduction should be allowed because Plaintiffs claimed mileage for that truck.[8]

### c. Other Expenses

Plaintiffs provided receipts substantiating a custom hire expense of $9,908 and explained its business purpose through Steven's sworn testimony. Plaintiffs' receipts substantiate the following expenses: $540 for feed; $2,758 for repairs and maintenance; and $652 for supplies. (*See generally* Ptfs' Exs 26, 28, 29.) The remaining claimed expenses in each of those categories were unsubstantiated, personal in nature, or supported only by illegible or un-itemized receipts.[9] (Ptfs' Ex 26 at 4, 8-10, 13, 15-18; Ex 28 at 2, 10, 12, 13, 17-24, 31-35, and 37; Ex 29 at 1-3, 5, 7, 9-17, 19-21, and 23.) Plaintiffs' claimed expenses for oil, fuel, and gas are disallowed because

/ / /

---

[7] Plaintiffs conceded, and their records substantiate, that the cost basis of the John Deere tractor 4200 was $13,000. Plaintiffs placed the tractor in service in 2006 and calculated prior depreciation of $6,643. (*See* Ptfs' Ex 25 at 2.) Plaintiffs should only have taken $5,833 in prior depreciation, which is $810 less than the amount they actually claimed. A deduction claimed on a prior return that was not audited was "allowed" for purposes of IRC section 1016(a)(2). *See Virginia Hotel Corp. of Lynchburg v. Helvering*, 319 US 523, 527, 63 S Ct 1260 (1943) ("If the deductions are not challenged, they certainly are 'allowed' since tax liability is determined on the basis of the returns"). As a result, Plaintiffs' allowable deduction of $1,593 for the 2009 tax year must be reduced by $810.

[8] "A deduction using the business standard mileage rate is computed on a yearly basis and is in lieu of all fixed and variable costs of the automobile allocable to business purposes * * *. Items such as depreciation (or lease payments), maintenance and repairs, tires, gasoline (including all taxes thereon), oil, insurance, and license and registration fees are included in fixed and variable costs for this purpose." Rev Proc 2008-72, § 5.03 (2008).

[9] Plaintiffs claimed purchases of green peas and other vegetables as duck feed, but provided no testimony at trial or other evidence to corroborate that such purchases were for the farm rather than personal consumption. (*See* Ptfs' Ex 26 at 8, 13, 15-18.)

the court cannot determine whether those expenses were business or personal in nature and whether they duplicate mileage deductions claimed by Plaintiffs.[10]

D.      *Plaintiffs' Claimed Theft Loss*

IRC section 165(a) provides a deduction for "any loss sustained during the taxable year and not compensated for by insurance or otherwise."  For individuals, the deduction is limited to:

"(1) losses incurred in a trade or business;

"(2) losses incurred in any transaction entered into for profit, though not connected with a trade or business; and

"(3) * * * losses of property not connected with a trade or business or a transaction entered into for profit, if such losses arise from fire, storm, shipwreck, or other casualty, or from theft."

IRC § 165(c).  "Losses from sales or exchanges of capital assets shall be allowed only to the extent allowed in sections 1211 and 1212."  IRC § 165(f).

"For purposes of the IRC, whether a theft occurred depends upon the laws of the jurisdiction in which the loss occurred."  *Vieceli v. Dept. of Rev.*, 20 OTR 212, 217 (2010), citing *Grotheus v. Comm'r*, 84 TCM (CCH) 561, 568 (1992).  In considering a claimed theft loss deduction from a "bank-guaranty transaction," the Tax Court had to "resolve a predicate factual dispute * * * regarding the nature of the purported bank-guaranty transaction."  *Halata v. Comm'r*, 104 TCM (CCH) 804, WL 6618763 at *1, *2, *9 (2012).  The court concluded that "the purported bank-guaranty transaction was fictitious" and, therefore, a theft.  *Id.* at *10.  The court reviewed documents memorializing the transaction and correspondence, and noted the lack of contract documents provided to the taxpayer.  *Id.* at *9.  In this case, Plaintiffs have presented

/ / /

---

[10] Plaintiffs claimed mileage for four different vehicles.  As discussed above, the business standard mileage rate includes costs for gasoline and oil.  *See* Rev. Proc. 2008-72, § 5.03 (2008).

no evidence describing their Lehman Brothers investment and, as a result, the court has no facts upon which to determine whether a theft occurred, as Plaintiffs contend.

E. *Substantial Understatement of Income Penalty*

Plaintiffs argue that the substantial understatement of income penalty should not be imposed in this case. (Ptfs' Trial Mem at 7.) Plaintiffs contend that "substantial authority" exists for Plaintiffs' claimed business deductions, farm loss, and theft loss. (Ptfs' Ex 31 at 1.)

When reported income is understated in excess of $15,000 in a taxable year, "there shall be added to the amount of tax required to be shown on the return a penalty equal to 20 percent of the amount of any underpayment of tax attributable to the understatement of taxable income." *See* ORS 314.402. "When determining if an understatement is substantial, the understatement does not include items for which * * * [s]ubstantial authority exists (or existed at the time the taxpayer claimed it on the return) for the tax treatment of the time in question[.]" OAR 150-314.402(4)(b)(2)(a). " 'Substantial authority' has the same meaning as used in Treasury Regulation 1.6662-4(d)." OAR 150-314.402(4)(b)(1)(a).

"The substantial authority standard is an objective standard involving an analysis of the law and application of the law to relevant facts. The substantial authority standard is less stringent than the more likely than not standard * * * but more stringent than the reasonable basis standard as defined in § 1.6662-3(b)(3)." Treas Reg § 1.6662-4(d)(2). "There is substantial authority for the tax treatment of an item only if the weight of the authorities supporting the treatment is substantial in relation to the weight of authorities supporting contrary treatment." Treas Reg § 1.6662-4(d)(3)(i). "Items for which there is adequate disclosure" are treated as if shown properly on the return and are "not included in the understatement for that year." Treas Reg § 1.6662-4(e)(1). There is no adequate disclosure where the item "[i]s not

properly substantiated, or the taxpayer failed to keep adequate books and records with respect to the item or position." Treas Reg § 1.6662-4(e)(2)(iii). In *Norgaard v. Comm'r*, 939 F2d 874, 886 (9th Cir 1991), the taxpayers sought to substantiate claimed gambling losses with losing tickets. Although it did not allow taxpayers' claimed deductions, the Ninth Circuit found there was substantial authority for the taxpayers' substantiation. *Id.* at 880-81. The Court explained,

> "the tax courts have allowed partial or full deductions for gambling losses when the taxpayer has presented losing tickets, partial records and credible testimony. * * * On the other hand, some tax courts have refused to allow any deductions where the taxpayers have presented only losing tickets. * * * The credibility of the taxpayer is the critical factor in these cases. Each case is fact specific."

*Id.* at 881. In *Roumi v. Comm'r*, 103 TCM (CCH) 1006, WL 10811 at *6-7 (2012), the Tax Court upheld the accuracy-related penalty because the taxpayer's claimed Schedule C business deductions were not adequately substantiated, noting that taxpayer "had the duty to keep adequate records and to substantiate items properly * * *." The taxpayer's records had been destroyed in a fire and the taxpayer failed to adequately reconstruct the expenditures. *Id.* at *3-4.

To the extent that Plaintiffs failed to maintain adequate records to substantiate claimed expenses, Plaintiffs lacked substantial authority for those deductions. However, the court has allowed Plaintiffs several deductions previously denied by Defendant. As a result, Plaintiffs' understatement of income must be recalculated. Prior to issuance of the judgment in this case, Defendant shall submit a revised calculation of Plaintiffs' 2009 understatement based on the court's findings and in accordance with OAR 150-314.402(1). Defendant shall state whether the understatement exceeds $15,000, in which case the 20 percent penalty must be imposed under ORS 314.402(1) unless it is waived by Defendant under ORS 314.402(6).

/ / /

/ / /

## III. CONCLUSION

After careful consideration, the court concludes that, for the 2009 tax year, Plaintiffs are allowed an additional office expense deduction of $4,258; a supply expense deduction of $3,725; and a rent deduction of $2,750 for Sandra's nurse consulting business. The court further concludes that Plaintiffs engaged in their farming activity with a profit motive and substantiated the following farm expenses: $8,466 for depreciation; $9,908 for custom hire; $540 for feed; $2,758 for repairs and maintenance; and $652 for supplies. Plaintiffs' remaining claimed Schedule C and Schedule F expenses are denied. Plaintiffs failed to prove by a preponderance of the evidence that they are entitled to theft loss deduction of $28,495. Defendant shall calculate Plaintiffs' understatement of income penalty, if any. Now, therefore,

IT IS THE DECISION OF THIS COURT that, for the 2009 tax year, Plaintiffs are allowed an additional office expense deduction of $4,258; a supply expense deduction of $3,725; and a rent deduction of $2,750 for Sandra's nurse consulting business.

IT IS FURTHER DECIDED that Plaintiffs engaged in their farming activity with a profit motive and substantiated the following farm expenses: $8,466 for depreciation; $9,908 for custom hire; $540 for feed; $2,758 for repairs and maintenance; and $652 for supplies.

IT IS FURTHER DECIDED that Plaintiffs are not entitled to any of expenses claimed on their federal Schedule C and Schedule F.

IT IS FURTHER DECIDED that Plaintiffs failed to prove by a preponderance of the evidence that they are entitled to theft loss deduction of $28,495.

IT IS FURTHER DECIDED that, prior to issuance of the judgment in this case, Defendant shall submit a revised calculation of Plaintiffs' 2009 understatement based on the court's findings and in accordance with OAR 150-314.402(1). Defendant shall state whether the

understatement exceeds $15,000, in which case the 20 percent penalty must be imposed under

ORS 314.402(1) unless it is waived by Defendant under ORS 314.402(6).

Dated this ___ day of March 2015.

ALLISON R. BOOMER
MAGISTRATE

*If you want to appeal this Final Decision, file a complaint in the Regular Division of the Oregon Tax Court, by mailing to: 1163 State Street, Salem, OR 97301-2563; or by hand delivery to: Fourth Floor, 1241 State Street, Salem, OR.*

*Your complaint must be submitted within 60 days after the date of the Final Decision or this Final Decision cannot be changed. TCR-MD 19 B.*

*This document was signed by Magistrate Allison R. Boomer on March 13, 2015. The court filed and entered this document on March 13, 2015.*